**JOHNSON CONSTRUCTION, INC.,**
Plaintiff and Appellant,

v.

**RUGBY MUNICIPAL AIRPORT
AUTHORITY, Defendant
and Appellee.**

Civ. No. 910325.

Supreme Court of North Dakota.

Nov. 5, 1992.

Wayne O. Solberg, of Solberg, Stewart, Boulger, Miller & Johnson, Fargo, for plaintiff and appellant.

Murray G. Sagsveen, of Zuger, Kirmis, Bolinske & Smith, Bismarck, for defendant and appellee.

VANDE WALLE, Justice.

Johnson Construction, Inc. (Johnson), appealed from a district court judgment entered in its action against Rugby Municipal Airport Authority (Rugby) to recover damages under a construction contract. We affirm.

In October 1985, Rugby awarded Johnson a contract to construct a new runway

and related improvements for $548,142.90. Johnson was required to excavate a trench where the new runway would be located, replace the excavated "subcut" from the trench with suitable "backfill" or "embankment" material, compact the embankment material, spread a 6" layer of crushed rock or gravel, and lay asphalt pavement.

After completing the project, Johnson sought additional compensation. Negotiations were unsuccessful and Johnson sued Rugby for additional compensation. Johnson's claims involved two primary elements—excavation and paving. Johnson maintains that it was required to do more excavation and embankment work than had been anticipated. Johnson also asserts that Rugby employed an improper method of testing for pavement density uniformity, resulting in Johnson receiving a lower price than warranted.

The trial court disposed of Johnson's $131,331 excavation claim by granting Rugby's motion for partial summary judgment. Johnson's paving claim was tried to the court, which determined that Johnson did

not meet the required density standard and upheld Rugby's downward price adjustment. The court concluded that Johnson was due money on other matters not here at issue and entered judgment in Johnson's favor for $86,668.83. Johnson appealed, contending that the trial court erred in granting Rugby's motion for partial summary judgment dismissing the excavation claim and erred in concluding that Johnson was not entitled to additional payment on the asphalt paving claim.

### 1. Excavation

On the excavation claim, Rugby argued: (1) the additional excavation was caused by rainfall and Johnson was not entitled to additional compensation because contractors are responsible for weather-related expenses; (2) Johnson failed to provide notice, under § 50–16 [1] of the specifications, of its intention to seek additional compensation for excavation of subcut material; (3) there was no change order or supplemental agreement, as required by §§ 40–02 [2] and 40–04 [3] of the specifications; (4)

1. *"50–16 CLAIMS FOR ADJUSTMENT AND DISPUTES.* If for any reason the contractor deems that additional compensation is due him for work or materials not clearly provided for in the contract, plans, or specifications or previously authorized as extra work, he shall notify the engineer in writing of his intention to claim such additional compensation before he begins the work on which he bases the claim. If such notification is not given or the engineer is not afforded proper opportunity by the contractor for keeping strict account of actual cost as required, then the contractor hereby agrees to waive any claim for such additional compensation. . . .

"Nothing in this subsection shall be construed as a waiver of the contractor's right to dispute final payment based on differences in measurements or computations."

2. *"40–02 ALTERATION OF WORK AND QUANTITIES.* The owner reserves and shall have the right to make such alterations in the work as may be necessary or desirable to complete the work originally intended in an acceptable manner. Unless otherwise specified herein, the engineer shall be and is hereby authorized to make such alterations in the work as may increase or decrease the originally awarded contract quantities, provided that the aggregate of such alterations does not change the total contract cost or the total cost of any major contract item by more than 25 percent (total cost being based on the unit prices and estimated quanti-

ties in the awarded contract). Alterations which do not exceed the 25 percent limitation shall not invalidate the contract nor release the surety, and the contractor agrees to accept payment for such alterations as if the altered work had been a part of the original contract. These alterations which are for work within the general scope of the contract shall be covered by 'Change Orders' issued by the engineer. . . .

"Should the aggregate amount of altered work exceed the 25 percent limitation hereinbefore specified, such excess altered work shall be covered by supplemental agreement. . . ."

3. *"40–04 EXTRA WORK.* Should acceptable completion of the contract require the contractor to perform an item of work for which no basis of payment has been provided in the original contract or previously issued change orders or supplemental agreements, the same shall be called Extra Work. Extra Work that is within the general scope of the contract shall be covered by written change order. . . .

"When determined by the engineer to be in the owner's best interest, he may order the contractor to proceed with extra work by force account as provided in the subsection titled PAYMENT FOR EXTRA AND FORCE ACCOUNT WORK of Section 90.

"Extra work that is necessary for acceptable completion of the project, but is not within the general scope of the work covered by the original contract shall be covered by a Supplemental

the contract does not contain a "differing site conditions" or "changed conditions" clause, which would "shift the risk of unknown subsurface conditions (such as groundwater) from the contractor to the owner"; and (5) that Johnson chose to excavate additional material below the planned depth to quickly dry the subcut, and that excavation should be at Johnson's expense.

In its memorandum in opposition to Rugby's motion, Johnson summarized its position as follows:

"1. The additional excavation for which Johnson seeks compensation was not weather-related but rather, was caused primarily by the fact that substantial quantities of the excavation which was to be used for fill under the runway ('select embankment') was not suitable for that purpose. See Affidavit of Curtis L. Erickson.

"2. The notice of claim for additional compensation is not required because the basis of the claim is not 'extra work' as defined in Section 10–20 of the specifications. The claim relates only to the final quantity of excavation for which Johnson is entitled to compensation. See Affidavit of Joe Metzger and Section 50–16 (p. 1.032) of the specifications (copy attached.).[4]

"3. No change order or supplemental agreement is required, again because the basis of the claim is not 'extra work' as defined in the specifications. See Affidavit of Joe Metzger and Section 50–16 (p. 1.032) of the specifications (copy attached)."

■ In granting Rugby's motion for a partial summary judgment dismissing Johnson's excavation claim, the trial court concluded that notice of an intention to seek additional compensation was required, and that by failing to provide such notice, Johnson waived its right to make a claim:

"As a matter of law, the contract language clearly requires notice, a change order or supplemental agreement as a prerequisite to Plaintiff's excavation claim for additional compensation. The consequences for failure to give timely written notice or some type of written alteration of the contract, without a valid exception, constitutes a waiver of the right to make the claim. Therefore, Defendant's Motion for Partial Summary Judgment is meritorious as a matter of law and is *granted*."

The notice provision in § 50–16 of the specifications is similar to the notice provision in § 24–02–26.1, N.D.C.C., which we construed in *Byron's Constr. Co. v. North Dakota State Highway Dep't*, 448 N.W.2d 630 (N.D.1989). We observed that the notice statute protects important underlying concerns "by permitting early investigation of the validity of a claim when evidence is still available, by allowing the Highway Department to compile records of the contractor's costs, and by allowing the Highway Department to consider alternate methods of construction to prevent unnecessary expenditures." *Id.* at 633. We held that the notice provision required a contractor to provide written notice if it intended to seek additional compensation: "If Byron's was requested to perform work or supply materials for which it did not believe it was being compensated under the contract, it was required to notify the engineer in writing of its intent to make a claim for additional compensation." *Id.* at 634. *See also, Herman v. Magnuson*, 277 N.W.2d 445 (N.D.1979), in which we observed that notice requirements for presenting claims against a municipality foster prompt investigation while the evidence is still fresh, the adjustment of claims without the expense of litigation if the circum-

---

Agreement as hereinbefore defined in the subsection titled SUPPLEMENTAL AGREEMENT of Section 10.
"Any claim for payment of extra work that is not covered by written agreement (change order or supplemental agreement) shall be rejected by the owner."

4. "*10–20 EXTRA WORK.* An item of work not provided for in the awarded contract as previously modified by change order or supplemental agreement, but which is found by the engineer to be necessary to complete the work within the intended scope of the contract as previously modified."

stances warrant it, and the preparation of fiscal planning to meet possible liability. We do not believe that there is a significant distinction between the notice requirement in § 24–02–26.1, N.D.C.C., and § 50–16 of the specifications. We conclude that if Johnson believed it was being requested by Rugby's engineer to perform more excavation and embankment work than it had anticipated, and for which it did not believe it was being compensated under the contract, it was required by § 50–16 of the specifications to notify the engineer in writing of its intent to make a claim for additional compensation. By failing to provide that written notice, Johnson waived all claims for additional compensation for excavation and embankment work.

■■■ Johnson argues that excavation and embankment "are clearly 'provided for in the awarded contract' and cannot be classified as 'extra work' " as defined in § 10–20 of the specifications. However, Johnson acknowledged in its brief:

"As a result of the decision of the project engineer [that much of the material directly under the topsoil was not suitable for 'select embankment'], it was necessary to remove large quantities of earth, stockpile it and replace it after removing the material which was used for 'select embankment.' It is this *additional excavation* which forms the basis for the greater portion of the excavation claim of Johnson." (Emphasis added.)

In our view, "additional excavation" is "extra work" as defined by § 10–20 of the specifications, for which notice of an intent to claim additional compensation is required before doing the work or the contractor waives the right to claim additional compensation for that work. In any event, the requirement of notice of a claim for work or materials "not provided for in the awarded contract" should alert a contractor to provide notice if any doubt exists as to the right to payment. The provision should be construed to encourage, not discourage, notice of a claim for additional

compensation in order that the dispute be resolved then, when other options are available to the parties, rather than later when the work is completed and cannot be undone.

■■ Johnson argues that, pursuant to § 23 [5] of the Special Provisions, Rugby retained the right to change the total contract price by 25 percent, and, because the claim for additional excavation ($131,331) is less than 25 percent of the contract price, § 40–02 of the specifications does not apply to its claim for additional compensation for excavation. We disagree. Acceptance of Johnson's argument in this regard would render an owner powerless to protect itself from a 25 percent increase in the cost of a project. We are unable to discern such an intention from the language of the contract, the specifications, or the special provisions.

Johnson's reliance on the following sentence in § 50–16 is also misplaced: "Nothing in this subsection shall be construed as a waiver of the contractor's right to dispute final payment based on differences in measurements or computations." The dispute in this case is not "based on differences in measurements or computations," but upon whether or not Johnson was required to give written notice of an intent to claim additional compensation.

## 2. Paving

■■ Johnson claims to be due an additional $84,159.67 on the paving portion of the contract. The contract contained an FAA P–401 Specification, which seeks to assure uniform density specifications. Section 4.12 of the P–401 Specification provides for asphalt paving sampling and testing:

"4.12 ACCEPTANCE SAMPLING AND TESTING OF BITUMINOUS MIXTURE (DENSITY). *P*avement density will be determined by comparing the density of cores *t*aken from the compacted pavement to the density of laboratory-compacted specimens.

**5.** "23. CONTRACT PRICE ADJUSTMENTS. The Rugby Municipal Airport Authority reserves the right to increase or decrease the project by

plus or minus 25 percent without adjustment to any unit prices."

"(a) *Lot Sizes.* The pavement will be accepted for density on a lot basis. A lot will consist of:

"(1) one day's production where it is not expected to exceed 2,000 tons (1 814 000 kg)

"(2) a half day's production where a days production is expected to consist of between 2,000 and 4,000 tons (1 814 000 and 3 628 000 kg)

"(3) similar subdivisions for quantities greater than 4,000 tons

"(b) *Laboratory Density.* Bituminous mixture for laboratory-compacted specimens shall be sampled on a lot basis from trucks delivering material to the job site. The lot size shall be the same as indicated in paragraph 4.12(a) and shall be divided into four equal sublots. One sample shall be taken from each sublot on a random basis, in accordance with procedures contained in ASTM D3665. One laboratory compacted specimen shall be prepared from each sublot.

\* \* \* \* \* \*

"(c) *Core Density.* Cores for determining the density of the compacted pavement shall be taken on a lot basis. The lot size shall be the same as indicated in paragraph 4.12(a) and shall be divided into four equal sublots. One core shall be taken from each sublot on a random basis. . . .

"(d) *Pavement Density.* The target density (percent compaction) of each lot of in-place pavement shall be 98 percent of the average density of the laboratory-prepared specimens. The pavement density shall be determined by dividing the core density of each sublot by the average density of the laboratory-prepared specimens."

Special Provision 22(B)(6) provides:

"SAMPLING PAVEMENT. The contractor is required by the specifications to furnish all tools, labor and materials for patching the holes. These core samples are obtained for determining thickness and density of completed pavement. The measuring and testing of these samples is the responsibility of the Engineer and Owner. The cores shall have a diameter of four (4) inches and *one core shall be removed at a random location in each 22,500 square feet of paved surface area.*" (Emphasis added.)

During the paving period, the asphalt was tested in the following manner: (1) At the start of each workday, the contractor and the engineer estimated the asphalt production for the day. This estimated daily production was a "lot" or "target lot"; (2) The target lot was divided into four equal sublots; (3) One sample was taken from each sublot of the target lot on a random basis from trucks delivering the asphalt mix to the paving site and compacted under laboratory conditions to determine the density; (4) The actual daily production was a "lot" or "paved lot"; (5) The paved lot was divided into four equal sublots; (6) One core sample was taken from each sublot of the paved lot on a random basis; and (7) The core samples from the paved lots were compared with the laboratory-compacted samples from the target lots to determine the pavement density, upon which the price to be paid was based.

Johnson succinctly posed the issue for resolution on appeal:

"Resolution of the asphalt claim requires a determination as to the size of each lot and sublot, for sampling purposes. Rugby contends that the lots and sublots may vary in size, depending upon the daily bituminous mix production. Johnson contends that each lot consists of 90,000 square feet of paving with each sublot being 22,500 square feet. This determination requires an interpretation or construction of the contract between the parties and is therefore, a question of law for the court and is fully reviewable on appeal."

The testing procedure used when the runway was paved in 1986 involved paved lots and sublots which varied in size from day to day, depending upon a day's actual production. Johnson did not object to the testing procedure until 1990. Relying on the last sentence of Special Provision 22(B)(6), Johnson contended at trial and on appeal that each paved lot from which core samples were taken had to be 90,000

square feet and each sublot had to be 22,-500 square feet, without variation for day-to-day differences in daily production.

A contract is to be interpreted "to give effect to the mutual intention of the parties as it existed at the time of contracting." Section 9–07–03, N.D.C.C. A court "may consider the parties' actions after entering into the contract in ascertaining the intentions and construction placed upon the contract by the parties." *Tobias v. North Dakota Dep't of Human Services*, 448 N.W.2d 175, 179 (N.D.1989). Rugby awarded the airport runway contract to Johnson in October 1985. When Johnson was paving the runway in 1986, the testing procedure employed involved paved lots and sublots varying in size, depending upon the day's asphalt production. Johnson did not object to the testing procedure at that time.

Although one interpretation of the seemingly conflicting provisions may appear favorable to Johnson's position, the parties' actions at the time of the paving are indicative of a construction and intention that varying sizes of lots and sublots were proper and intended. The project engineer on this project, who had previously worked on 22 airport projects involving the P–401 Specification, testified that he had never previously heard of a fixed 22,500 square foot paved sublot. In light of the foregoing, we are not persuaded that the trial court erred in concluding that lot size "does not need to be a numerical value but can be the daily production" and that Rugby "complied with the Marshall density and core density sample procedure as found in the specifications and used those figures appropriately in determining the price adjustments."

The judgment is affirmed.

ERICKSTAD, C.J., and LEVINE, MESCHKE and JOHNSON, JJ., concur.