[This opinion has been published in *Ohio Official Reports* at 78 Ohio St.3d 353.]

FOSTER WHEELER ENVIRESPONSE, INC., APPELLEE AND CROSS-APPELLANT, *v*.
FRANKLIN COUNTY CONVENTION FACILITIES AUTHORITY, APPELLANT;
LAWHON & ASSOCIATES, INC., CROSS-APPELLEE.
[Cite as *Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention
Facilities Auth.*, 1997-Ohio-202.]

*Contracts—Removal and disposal of hazardous waste from construction site—
Action by excavator for breach of contract and negligent
misrepresentation—Motions for summary judgment by defendants proper,
when.*

(No. 95-2467—Submitted January 7, 1997—Decided May 14, 1997.)

APPEAL and CROSS-APPEAL from the Court of Appeals for Franklin County, No.
95APE04-401.

————————————

{¶ 1} This action arises out of a contract for the removal and disposal of hazardous waste from the construction site of the Greater Columbus Convention Center.

{¶ 2} Defendant-appellant, Franklin County Convention Facilities Authority ("CFA"), is a public agency governed by a volunteer public board pursuant to R.C. 351.04. Defendant and cross-appellee, Lawhon & Associates, Inc. ("Lawhon"), is an environmental consulting firm engaged by CFA on April 1, 1990, to perform hazardous material consulting services at the construction site of the convention center. Plaintiff-appellee and cross-appellant, Foster Wheeler Enviresponse, Inc. ("Enviresponse"), is an environmental hazards remediation contractor engaged by CFA on October 1, 1991, to excavate and dispose of certain hazardous waste discovered at the convention site.

**{¶ 3}** During the early phase of construction, a drain line was being installed in the southeast section of the property. The excavator tore the corner of a large wooden box buried beneath the surface, and coal tar waste was released from the box and into the sewer trench. Upon further investigation, the box was found to be sixty-one feet long, thirty-one feet wide and eleven feet deep, and filled with dirt and creosote. The area in which the box was located was formerly a railroad depot. It was believed that the box had been used as a pit in which railroad ties were creosoted, and that when the site was no longer used for this purpose the remaining creosote was left in the pit and covered with dirt.

**{¶ 4}** Laboratory analysis indicated that the constituent benzene was present in sufficient quantities to characterize the material in the box as hazardous waste. Upon the advice of Lawhon, and with the concurrence of the Ohio Environmental Protection Agency, CFA elected a plan of remediation which involved removing the clean soil above the creosote and contaminated soil, solidifying and removing the waste remaining in the box, excavating and transporting "[t]he solidified waste, waste contaminated earth, and all contaminated areas *** to a hazardous waste landfill for disposal," and backfilling the excavated area with clean fill.

**{¶ 5}** In July 1991, the contract for the disposal of the coal tar waste was publicly bid. The bid specifications stated:

"[T]he contents of the box consisted of 8 to 8.5 ft. of earth on top of 1.5 to 2 ft. of tar and tar contaminated material. *** The material has not moved into the soil, and there is little contamination outside of the box except in areas of recent disturbance. The quantity of tar and tar contaminated soil is estimated to be 140 cubic yards.

"Samples of the soil over the waste were taken *** down to 8 feet depth. Samples were composited from 0-3, 3-6, and 6-8 feet. *** The results show that

2

the soil above the waste has negligible contamination and can be placed back in the excavation."

**{¶ 6}** The cost for disposing of the coal tar waste was estimated at $175,000. Bidders were instructed to submit proposals for a base price to remove and dispose of the estimated one hundred forty cubic yards of contaminated waste, and for a unit price, to be used in the event that "the quantity of coal tar waste and contaminated soil that must be treated as hazardous waste is more or less than 140 cubic yards, the consultant's estimate."

**{¶ 7}** Enviresponse was found to be the lowest responsive and responsible bidder with a base bid of $165,000 and a unit price bid of $265 per cubic yard of waste. Accordingly, on October 1, 1991, CFA and Enviresponse entered into a contract on these terms for disposal of the coal tar waste.

**{¶ 8}** The contract between CFA and Enviresponse consists of an eleven-page writing entitled "CONTRACT," and several other writings specifically "made part of this Contract." The contract documents are identified as "[t]he plans, Specifications, General Conditions, Special Conditions, Addenda and other Contract Documents."

**{¶ 9}** The contract describes the work to be performed as "ITEM NO. 1— COAL TAR WASTE DISPOSAL—BASE BID," and sets forth that the "TOTAL AMOUNT OF THIS CONTRACT IS $165,000.00 subject to any additions or deductions during construction."

**{¶ 10}** Article 3 of the contract, entitled "CHANGE ORDERS, ADDITIONS, AND DEDUCTIONS," provides: "No alterations shall be made in the work shown or described by the plans and specifications, except upon the written order of the Owner, and when so made, the value of the work added or omitted shall be computed for approval by the Owner, and the amount so ascertained shall be added to or deducted from the base bid amount."

**{¶ 11}** Under Article 5, Section h of the general conditions, "it is understood that the scheduled quantities of work to be done and materials to be furnished may each be increased or decreased as hereinafter provided." Article 7, Section b of the general conditions provides:

"In instances involving a unit price Contract, the Owner may, by written instructions to the Contractor, make alterations in the Plans involving increases or decreases in the quantity of work as may be necessary. Such alterations shall not be considered a waiver of any conditions of the Contract, nor invalidate any of the provisions thereof, unless the alterations materially change the scope of the work. The cost of increases or decreases in quantities of items shall be computed at the unit price bid and shall be added to or deducted from the original Contract by the endorsement of Change Order forms."

**{¶ 12}** In a document entitled "CONTRACT ATTACHMENT A," the following is provided:

"UNIT PRICES

"*** The unit prices will apply to the net difference in quantities on any given change[.]

"The unit prices may be used to adjust the Contract sum should there be an authorized increase or decrease in the scope of work stated.

| "DESCRIPTION OF ITEM | UNIT | UNIT PRICE* |
|---|---|---|
| "All activities associated with disposal of coal tar waste in quantities either in excess of or less than the base bid of 140 cubic yards. | Cubic Yards | Two Hundred Sixty Five and 00/100 Dollars ($265.00) |

"* The unit price will be used to adjust the contract sum up or down depending on whether the quantity of coal tar waste and contaminated soil that must be treated as hazardous waste is more than or less than 140 cubic yards, the

consultant's estimate. Adjustments will not be made for less than one cubic yard and will be made to the closest cubic yard. Contractor shall make measurements observed by a representative of the consultant."

{¶ 13} On October 15, 1991, Enviresponse commenced excavation of the soil above the waste. However, it began to encounter odors and saturated soil sooner than anticipated based on the bid specifications. On the same day, David "Mike" Finton, then manager of Enviresponse's Ohio office, telephoned Claire A. Sawaya, then Executive Director of CFA, to inform her that there was more coal tar waste than originally estimated.

{¶ 14} According to Finton, Sawaya told him that he "should take *** direction from Lawhon." Finton "took that to mean that what Lawhon told [him] to do was how [he] was to proceed with this project." It was Finton's understanding that Enviresponse would automatically be paid the unit price for all contaminated material removed in excess of one hundred forty cubic yards, so long as Lawhon took measurements confirming the amount of material that was being excavated. However, Finton testified that he did not specifically recall any discussion with Sawaya concerning unit price, and that Sawaya "[a]bsolutely [did] not" indicate that Enviresponse was free to disregard the contract documents.

{¶ 15} According to Sawaya, her conversation with Finton dealt specifically with Finton's contention that the soil already removed from on top of the coal tar waste was contaminated. It was Sawaya's impression that Finton wanted owner approval to dispose of the material that Enviresponse had excavated. Since no determination had yet been made by Lawhon that such soil was contaminated, she told Finton "that it was his responsibility to contact Lawhon with respect to what he believed the site conditions to be and that [CFA] would take advice from Lawhon concerning the scope of the work." She presumed, however, that if additional material needed to be disposed of, "the normal [written] change order and [written] authorization process would proceed."

**{¶ 16}** Against this backdrop of divergent presumptions, Enviresponse continued to remove and transport hazardous waste from the construction site. However, the migration of contaminants outside the box proved to be quite extensive. Paul Braun, Lawhon's on-site monitor, observed that "every time they [Enviresponse] dug 10 more feet, it [the contamination] would just be as bad as it was when they started," and agreed that there "[s]eem[ed] to be no end to the lateral movement of the contaminated material."

**{¶ 17}** On October 27, 1991, Finton faxed a letter to Gilbert E. Raines, Ph.D., Vice-President of Engineering for Lawhon, informing as to "the current status of the project and to give *** some indication of where *** the project is headed." The letter stated that one thousand four hundred cubic yards of additional waste beyond the original estimate of one hundred forty cubic yards had been removed from the pit and transported by the truckload to the Envirosafe facility in Oregon, Ohio. "At $265 per cubic yard [the unit price], the additional cost for exhumation, transport and disposal of material from the pit is $371,000." The letter also estimated that there remained "an additional eight hundred (800) cubic yards of material to be removed from the pit *** represent[ing] an additional cost of $212,000."

**{¶ 18}** The next morning, Lawhon faxed a response to Finton advising "that no additional costs other than those in the base contract are to be incurred unless prior written approval is received from us."

**{¶ 19}** Nevertheless, Enviresponse continued to transport hazardous material from the construction site to the Envirosafe landfill until October 31, when Lawhon told it to cease activities.[1] According to Finton, the work continued

---

1. It is not entirely clear from the record whether Enviresponse also continued excavation between October 28 and October 31, 1991. It appears from Finton's October 27 letter to Raines that, as of that time, Enviresponse had "removed" an extra one thousand four hundred cubic yards of contaminated material from the pit, and estimated that another eight hundred cubic yards "must be removed from the still contaminated side walls." However, Enviresponse ultimately notified

because, despite Lawhon's October 28 fax, Braun was "still signing [hazardous waste] manifests [for disposal of the material at the landfill] and still shipping loads even as this thing [the October 28 fax] was being sent to us [Enviresponse]."[2] Patrick H. Bigelow, Enviresponse's project superintendent, testified at deposition that "[e]verything we took out of there was directed to us by Paul Braun."

{¶ 20} Braun admitted that he filled out and signed waste manifests for each truck that left the construction site destined for Envirosafe, both before and after October 28, 1991.[3]  He admitted that on October 18, he asked whether Envirosafe could expose a sand seam outside the box to confirm that contaminants had migrated outside the box.  Except for this request, he testified that he gave no direction to Enviresponse on how to proceed, that he was a passive observer to the work being performed by Enviresponse, and that Enviresponse was operating completely of its own accord.

{¶ 21} The record also reveals some disparity as to whether Braun represented that written authorization was unnecessary to trigger payment under

---

Lawhon on November 8 that "[t]he extra amount is 3546 yd$^3$ x \$256/yd$^3$ = \$939,690.00."  This would appear to indicate that excavation was ongoing after October 28.  However, Finton testified at deposition that after receiving Lawhon's fax on the morning of October 28, "we continued to ship loads.  We did not continue to excavate."  Yet, at another point in his testimony, Finton explained that he "really [did not] know for certain" whether Enviresponse continued to excavate after receiving Lawhon's October 28 fax.  Braun testified that excavation activities continued after October 28.

2. Finton was not aware of whether CFA was provided copies of the manifests as the work was ongoing.  However, Sawaya testified that she did receive copies of the waste manifests that were returned by Envirosafe.

3. There were initial problems regarding the signing of the manifests. Each manifest contained a generator's certification.  There was some trepidation on the part of CFA in signing the manifest because it was not the generator of the waste.  Accordingly, CFA attached a statement to each manifest explaining its role vis-à-vis  the contamination.  Also, manifests for the first three trucks leaving the construction site were executed by Sawaya.  This apparently created some inefficiency.  Thus, Braun was given authority to sign all manifests thereafter.

the unit-price provision of the CFA-Enviresponse contract. The following colloquy took place at Finton's deposition:

"Q. Did you ever have any conversations with Paul Braun where he specifically told you that he was the agent of [CFA]? And specifically the word 'agent.'

"A. I don't recall any.

"Q. Do you recall any conversations with Paul Braun where he specifically advised you that there was no need for [Enviresponse] to obtain a written change order or written authorization from [CFA] in order for [Enviresponse] to be paid for hazardous waste above and beyond 140 cubic yards?

"A. As I indicated before, the only time that change orders were discussed were well past this time, November 4th, and by Bill Lawhon."

{¶ 22} However, in an affidavit filed subsequent to the taking of his deposition, Finton stated:

"On one of my visits to the job site after the additional contamination was discovered, I asked Paul Braun whether he had approval to direct us [Enviresponse] to remove the additional contaminated material. Braun assured us that he did have approval from his superiors and that we (Enviresponse) would be paid for the additional work."

{¶ 23} Also contained within the record are the field notes of Hank Markferding, who was an on-site sales representative of Enviresponse.[4] The note

---

4. It is unclear from the record what role Markferding played at the construction site. He was apparently hired by Enviresponse in the summer of 1991 primarily as a salesman. According to Finton's deposition testimony, Markferding had no prior experience as a hazardous waste remediation specialist, and was not assigned by Enviresponse to act in any authoritative capacity at the construction site. Finton explained further that Markferding "had sold this project, this was his find, and, therefore, he wanted to make sure that the project went well. And he was also interested in being on site and learning firsthand how these projects were done."

Yet, in qualifying Markferding's field notes, Finton stated in his affidavit, "Hank Markferding [was] assigned by me to work on the Franklin County Convention Center coal tar remediation project. *** Markferding *** [was] present at the job site during my visits throughout the excavation, and gave me periodic reports of the activity on-site."

dated October 16 reads in part: "Consultant states that the contract allows for the extra work without a change order."

{¶ 24} Braun denies having ever made that or any similar statement. According to Braun, whenever Markferding would question him as to the extra work or the unit price, he would inform Markferding that that was an issue for Enviresponse to take up with CFA.

{¶ 25} On November 8, 1991, Enviresponse submitted a request for clarification, seeking "an increase in fee to cover the work performed for additional hazardous waste material removed, transported, and disposed of at the Envirosafe Landfill. *** The extra amount is 3546 yd$^3$ x $265/yd$^3$ = $939,690.00." That same day, Lawhon denied the request on the basis that "[a]ll material removed beyond the amount specified in the contract [*i.e.*, one hundred forty cubic yards] required written authorization."

{¶ 26} Thereafter, Enviresponse initiated this action against CFA and Lawhon, alleging that CFA had breached its contract, and that Lawhon had negligently misrepresented the amount of hazardous waste that was present at the construction site and that there was no need to obtain written authorization.

{¶ 27} Initially, Lawhon filed a motion to dismiss pursuant to Civ.R. 12(B)(6), which the trial court granted. However, the court of appeals reversed and remanded the cause in *Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facilities Auth.* (1993), 88 Ohio App.3d 73, 623 N.E.2d 134.

{¶ 28} After completion of discovery, the trial court granted CFA's and Lawhon's motions for summary judgment.

---

Markferding was dismissed after the project was terminated and apparently CFA was unable to schedule his deposition. CFA filed a motion with the trial court to strike Markferding's affidavit or, alternatively, to exclude his field notes. This motion was denied. The court of appeals held moot CFA's assignment of error on its cross-appeal regarding the striking of Markferding's affidavit. As to the field notes, the appellate court found that the granting or denying of a motion *in limine* is an interlocutory order and, therefore, not final and appealable. No further appeal to this court has been taken regarding these issues.

**{¶ 29}** The court of appeals reversed the trial court's judgment as to CFA, but affirmed its decision as to Lawhon on the basis that since Enviresponse "is entitled to compensation under its contract with CFA, *** plaintiff [Enviresponse] cannot show that it relied upon, or that it suffered pecuniary loss as a result of either of Lawhon's alleged negligent misrepresentations."

**{¶ 30}** The cause is now before this court pursuant to the allowance of a discretionary appeal and cross-appeal.

_____

*Vorys, Sater, Seymour & Pease, Michael W. Donaldson* and *John C. Elam*, for appellee and cross-appellant.

*Chester, Willcox & Saxbe, Richard A. Frye, John J. Chester* and *Karen H. Penley*, for appellant.

*Taft, Stettinius & Hollister* and *Michael A. Byers*, for cross-appellee Lawhon & Associates.

*Janet E. Jackson,* City Attorney, and *Daniel W. Drake,* First Assistant City Attorney, urging reversal for *amicus curiae,* city of Columbus, Ohio.

*John E. Gotherman,* urging reversal for *amici curiae,* Ohio Municipal League and Ohio Municipal Attorneys Association.

*Calfee, Halter & Griswold, Stanley J. Dobrowski* and *Albert J. Lucas*, urging reversal for *amicus curiae,* Ohio Building Authority.

_____

**ALICE ROBIE RESNICK, J.**

**{¶ 31}** The broad issue in this case is whether Enviresponse may recover from CFA, or alternatively from Lawhon, for the contaminated material in excess of one hundred forty cubic yards that Enviresponse excavated and transported from the construction site of the Greater Columbus Convention Center. Since the cause comes to the court upon an appeal from summary judgment, our inquiry is circumscribed by the standard set forth in Civ.R. 56(C).

I

CFA'S APPEAL

{¶ 32} It is universally recognized that where a building or construction contract, public or private, stipulates that additional, altered, or extra work must be ordered in writing, the stipulation is valid and binding upon the parties, and no recovery can be had for such work without a written directive therefor in compliance with the terms of the contract, unless waived by the owner or employer. *Lathrop Co. v. Toledo* (1966), 5 Ohio St.2d 165, 34 O.O.2d 278, 214 N.E.2d 408; *Portsmouth v. Nicola Bldg. Co.* (1922), 106 Ohio St. 550, 140 N.E. 174; *Expanded Metal Fire-Proofing Co. v. Noel Constr. Co.* (1913), 87 Ohio St. 428, 101 N.E. 348; *Carthage v. Diekmeier* (1909), 79 Ohio St. 323, 87 N.E. 178; *Baltimore & Ohio RR. Co. v. Jolly Bros. & Co.* (1904), 71 Ohio St. 92, 72 N.E. 888; *Ashley v. Henahan* (1897), 56 Ohio St. 559, 47 N.E. 573; *Cincinnati v. Cameron* (1878), 33 Ohio St. 336; 65; American Jurisprudence 2d (1972) 75-87, Public Works and Contracts, Sections 189-198; Annotation, Effect of Stipulation, In Private Building or Construction Contract, That Alterations or Extras Must Be Ordered In Writing (1965), 2 A.L.R.3d 620, 631, Section 3; Annotation, Effect of Stipulation, In Public Building or Construction Contract, That Alterations or Extras Must Be Ordered In Writing (1965), 1 A.L.R.3d 1273, 1281-1282, Section 3; 7 P.O.F.2d (1975) 239, 247-248, Authorization for Extra Work Under Building Contract, Section 2; 25 P.O.F.2d (1981) 561, 571, 573-574, Building and Construction Contracts--Waiver of Provision Requiring Written Change Orders, Sections 2 and 3.

{¶ 33} The pivotal question in this case is whether the contract between CFA and Enviresponse should be interpreted to contain a requirement for written authorization where more than the base amount of one hundred forty cubic yards of contaminated material is found to be present at the site.

{¶ 34} Despite the parties' attempts to correlate this case with others, our review of the innumerable cases and commentary on the subject leads us to the

inescapable conclusion that the meaning of any particular construction contract is to be determined on a case-by-case and contract-by-contract basis, pursuant to the usual rules for interpreting written instruments.  See *Cameron, supra*, 33 Ohio St. at 374.

{¶ 35} The cardinal purpose for judicial examination of any written instrument is to ascertain and give effect to the intent of the parties.  *Aultman Hosp. Assn. v. Community Mut. Ins. Co.* (1989), 46 Ohio St.3d 51, 53, 544 N.E.2d 920, 923.  "The intent of the parties to a contract is presumed to reside in the language they chose to employ in the agreement."  *Kelly v. Med. Life Ins. Co.* (1987), 31 Ohio St.3d 130, 31 OBR 289, 509 N.E.2d 411, paragraph one of the syllabus.

{¶ 36} "Common words appearing in a written instrument will be given their ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly evidenced from the face or overall contents of the instrument."  *Alexander v. Buckeye Pipe Line Co.* (1978), 53 Ohio St.2d 241, 7 O.O.3d 403, 374 N.E.2d 146, paragraph two of the syllabus.  Technical terms will be given their technical meaning, unless a different intention is clearly expressed.  *Cincinnati Ins. Co. v. Duffield* (1856), 6 Ohio St. 200, paragraph one of the syllabus.

{¶ 37} Most important to this case, a writing, or writings executed as part of the same transaction, will be read as a whole, and the intent of each part will be gathered from a consideration of the whole.  *Legler v. United States Fid. & Guar. Co.* (1913), 88 Ohio St. 336, 103 N.E. 897; *Kelly v. Carthage Wheel Co.* (1900), 62 Ohio St. 598, 610, 57 N.E. 984, 986; *Lesher v. Karshner* (1890), 47 Ohio St. 302, 305, 24 N.E. 882; *Miller v. Ratterman* (1890), 47 Ohio St. 141, 156, 24 N.E. 496, 499; *Cincinnati, Sandusky & Cleveland  RR. Co. v. Indiana, Bloomington & W. Ry. Co.* (1886), 44 Ohio St. 287, 7 N.E. 139; *Dodd v. Bartholomew* (1886), 44 Ohio St. 171, 175, 5 N.E. 866, 867.  See, also, *New York Coal Co. v. New Pittsburgh Coal Co.* (1912), 86 Ohio St. 140, 167, 174, 99 N.E. 198, 204, 206 (recognizing the

maxim *noscitur a sociis*, that the meaning of words or provisions in a contract may be indicated or controlled by those with which they are associated).

{¶ 38} Both CFA and Enviresponse agree upon the rule as expressed in *Farmers Natl. Bank v. Delaware Ins. Co.* (1911), 83 Ohio St. 309, 94 N.E. 834, paragraph six of the syllabus:

"In the construction of a contract courts should give effect, if possible, to every provision therein contained, and if one construction of a doubtful condition written in a contract would make that condition meaningless, and it is possible to give it another construction that would give it meaning and purpose, then the latter construction must obtain."

{¶ 39} Although these rules contain a measure of flexibility in their application, they are designed only to ascertain the parties' intent. It is not the responsibility or function of this court to rewrite the parties' contract in order to provide for a more equitable result. A contract "does not become ambiguous by reason of the fact that in its operation it will work a hardship upon one of the parties thereto." *Ohio Crane Co. v. Hicks* (1924), 110 Ohio St. 168, 172, 143 N.E. 388, 389. See, also, *Aultman Hosp. Assn., supra*, 46 Ohio St.3d at 54-55, 544 N.E.2d at 924.

{¶ 40} The parties and the courts below all agree that Enviresponse was required under its contract with CFA to obtain written authorization for any changes in the "scope of work." However, the court of appeals took the view that written authorization was required *only* for changes in the "scope of work." Accordingly, it saw the determinative issue as being whether the removal and disposal of contaminated waste in excess of the base bid amount of one hundred forty cubic yards could properly be characterized as an "increase *** in the scope of work stated." The appellate court concluded that no change in the scope of work occurred when Enviresponse excavated and transported more than the estimated one hundred

forty cubic yards and, therefore, no written authorization was required. We disagree.

{¶ 41} Article 3 of the contract provides that "[n]o *alterations* shall be made in the work shown or described by the plans and specifications, except upon the written order of the Owner." (Emphasis added.) Only after the alteration is made pursuant to a written order is the "value of the work added *** [to] be computed ***, and the amount so ascertained [to] be added to *** *the base bid amount*." (Emphasis added.) Article 7, Section b of the general conditions makes clear that the term "alterations" is intended to encompass "increases *** in the quantity of work." Whatever legal significance there may be in other contexts of defining "scope of work," and regardless of whether the removal of excess contaminated waste falls within that definition, such work constitutes an "alteration," as that term is used in this contract, for which a written order is required.

{¶ 42} Enviresponse argues that such an interpretation fails to give meaning and purpose to "the final paragraph of [*i.e.*, the footnote in] the Unit Prices Attachment A." According to Enviresponse, we must "establish[] constructions of the second and final paragraphs of the Unit Prices Attachment A that [give] 'meaning and purpose' *** to both paragraphs." The construction urged is that "CFA obligated itself to pay Enviresponse for each cubic yard of hazardous waste beyond the 140 cu. yd. estimate. *** [T]he mechanism for obligating itself was *not* by written change order *but instead* by contractor measurements observed by the consultant."

{¶ 43} If the Unit Price Attachment constituted the entire agreement between CFA and Enviresponse, we might find some merit in Enviresponse's interpretation of the footnote thereto. However, the point to reading the contract as a whole is to avoid this very kind of abstract interpretation. In construing the agreement, we must attempt to give effect to each and every part of it, not just "the second and final paragraphs of the Unit Price Attachment A," and avoid any

interpretation of one part which will annul another part. *Legler, supra,* 88 Ohio St. 336, 103 N.E. 897; *Farmers Natl. Bank, supra*, 83 Ohio St. 309, 94 N.E. 834, at paragraph six of the syllabus.

{¶ 44} Construing the agreement as a whole, we find that the parties' intent in inserting the footnote was to set forth a prenegotiated unit price for adjusting the contract sum in the event an alteration involving an increase or decrease in the quantity of work was ordered in writing. The unit price is a preset method of calculating the value of additional work to be used to adjust the contract sum where the amount of waste is found to be more than the one hundred forty cubic yards. It is not a prenegotiated waiver of the requirement for written authorization. "The compensation to be paid was, therefore, based upon a price fixed as a result of competitive bidding, and was not left to the subsequent agreement of the parties when it might be possible for either to take advantage of the situation of the other." *Nicola, supra*, 106 Ohio St. at 557, 140 N.E. at 176.

{¶ 45} This interpretation affords meaning and purpose to all parts of the agreement, whereas the interpretation urged by Enviresponse would in effect annul those parts requiring a written order for any alteration. The primary purpose of requiring written authorization for alterations in a building or construction contract is to protect the owner against unjust and exorbitant claims for compensation for extra work. It is generally regarded as one of the most effective methods of protection because such clauses limit the source and means of introducing additional work into the project at hand. It allows the owner to investigate the validity of a claim when evidence is still available and to consider early on alternative methods of construction that may prove to be more economically viable. It protects against runaway projects and is, in the final analysis, a necessary adjunct to fiscal planning. *Ashley, supra*, 56 Ohio St. at 572-573, 47 N.E. at 57; *Cameron, supra*, 33 Ohio St. at 369-370; *Johnson Constr., Inc. v. Rugby Mun. Airport Auth.* (N.D.1992), 492 N.W.2d 61, 63-64; 65 American Jurisprudence 2d, *supra*, at 76,

Section 190; 25 P.O.F.2d, *supra*, at 569, Section 1.  It is doubtful that the footnote was intended to serve in any capacity which would override the written-order provisions, or permit an increase of the contract sum solely upon the unilateral performance of additional work by Enviresponse.

{¶ 46} Enviresponse further argues that it is entitled to recovery pursuant to *Nicola, Lathrop,* and *Cameron, supra*.  These cases essentially provide that, under proper circumstances, the refusal of a public entity to give a contractor a written order for alterations, in accordance with a contract stipulation therefor, may constitute a breach of the contract or amount to a waiver of written orders.  However, in each case it was undisputed that the alteration was in fact ordered, either orally or in writing, by someone with the authority to do so.

{¶ 47} There is no evidence in the record that CFA ordered Enviresponse to remove and transport more than the base amount of one hundred forty cubic yards of contaminated waste.  The most that can be inferred from the record is that CFA had knowledge that alterations involving increases in the quantity of work were being made, and asserted no objection.  However, mere knowledge, and even acquiescence, is not enough for recovery.  *Lathrop, supra*, 5 Ohio St.2d at 174, 34 O.O.2d at 283, 214 N.E.2d at 414; *Diekmeier, supra*, 79 Ohio St. at 344-345, 87 N.E. at 184.  "Such stipulation [for a written order] being for the benefit of the employer, proof of a waiver must either be in writing, or by such clear and convincing evidence as to leave no reasonable doubt about it."  *Ashley, supra*, 56 Ohio St. 559, 47 N.E. 573, paragraph five of the syllabus.  Thus, "'[e]quivocal conduct, or conduct of doubtful import, is not sufficient.'"  *Id.*, 56 Ohio St. at 574, 47 N.E. at 577, quoting *O'Keefe v. St. Francis's Church* (1890), 59 Conn. 551, 561, 22 A. 325, 327.

{¶ 48} Nor can recovery against CFA be predicated on actions taken or statements made by Lawhon.  It is generally recognized that, in the absence of express authority, an engineer, architect, superintendent or inspector in charge of

or assigned to public building or construction work has no power to waive or modify a stipulation requiring a written order for alterations, even where that person may authorize alterations in writing. *Jolly Bros. & Co., supra*, 71 Ohio St. 92, 72 N.E. 888, at paragraph one of the syllabus; *Ashley, supra*, 56 Ohio St. at 572-573, 47 N.E. at 576; Annotation, *supra*, 1 A.L.R.3d at 1312-1318, Sections 21-25; 65 American Jurisprudence 2d, *supra*, at 81-82, Public Works and Contracts, Section 194. There is nothing about the nature and duties of an environmental consultant that would suggest that he falls outside the purview of this rule. There was nothing in either the contract between CFA and Enviresponse or the contract between CFA and Lawhon which gave Lawhon the authority to waive the requirement for written orders. Under the CFA-Lawhon contract, Lawhon's authority is limited to ordering "minor changes in the Work not involving an adjustment in the Contract sum or an extension of the Contract Time."

{¶ 49} Accordingly, summary judgment was properly entered in favor of CFA, and the judgment of the court of appeals is reversed on this issue.

II

ENVIRESPONSE'S CROSS-APPEAL

{¶ 50} The issue presented here is whether Enviresponse may proceed against Lawhon on its claims for negligent misrepresentation.

{¶ 51} In its first claim, Enviresponse alleges that "[t]he bid specifications and the contract [prepared by Lawhon] negligently represented that the amount of contaminated waste was approximately 140 cubic yards, that the soil immediately above the waste had negligible contamination and could be used as backfill, and that there was little contamination of soil outside the box."

{¶ 52} In its second claim, Enviresponse alleges that Lawhon misrepresented that "no additional authorization was needed to remove the additional contaminated material discovered on the site." In support, Enviresponse relies upon Finton's affidavit and Markferding's field notes.

**{¶ 53}** Enviresponse's argument is primarily devoted to distinguishing the court's decision in *Floor Craft Floor Covering, Inc. v. Parma Community Gen. Hosp. Assn.* (1990), 54 Ohio St.3d 1, 560 N.E.2d 206. There it was held that "[i]n the absence of privity of contract no cause of action exists in tort to recover economic damages against design professionals involved in drafting plans and specifications." *Id.* at the syllabus. Enviresponse contends that Lawhon was given excessive control over Enviresponse on this project, and that such control constitutes a sufficient nexus between them to substitute for contractual privity. See *In re Hughes-Bechtol, Inc.* (Bankr.S.D.Ohio 1991), 124 B.R. 1007, 1019-1020; *A.R. Moyer, Inc. v. Graham* (Fla.1973), 285 So.2d 397; Annotation, Tort Liability of Project Architect for Economic Damages Suffered by Contractor (1975), 65 A.L.R.3d 249.

**{¶ 54}** There is no need for the court to revisit, clarify, or define the parameters of *Floor Craft* at this time. It is sufficient to note that there is no such thing as a cause of action for excessive control. Privity, or its substitute, is not a tort; it serves only to identify an interest or establish a relationship necessary to allow for the bringing of a tort action for purely economic damages. Regardless of whether the threshold requirement for privity is met, or even justified, there can be no recovery where a necessary element to the tort itself is found to be missing.

**{¶ 55}** Article 5, Section h of the general conditions cautions that "[i]n unit price Contracts, the quantities listed in the Form of Proposal are to be considered as approximate and are to be used for the comparison of bids only." This language operates as a disclaimer, putting Enviresponse on notice not to rely on the estimates as to the quantity of waste. See *Delman v. Cleveland Hts.* (1989), 41 Ohio St.3d 1, 4, 534 N.E.2d 835, 837-838. Thus, "as a matter of law, [Enviresponse] could not have justifiably relied on the alleged misrepresentation of the quantity of waste." *R.J. Wildner Contracting Co., Inc. v. Ohio Turnpike Comm.* (N.D.Ohio 1996), 913 F.Supp. 1031, 1040.

**{¶ 56}** Enviresponse argues that *Wildner* does not apply because Lawhon did not have a contract with Enviresponse; thus, the disclaimer cannot protect Lawhon. However, the gravamen of Enviresponse's claim is that the alleged misrepresentations emanated from "[t]he bid specifications and the contract." These documents formed the agreement between Enviresponse and CFA. Thus, the very sources of the alleged misrepresentations embodied a disclaimer as to reliance thereon.

**{¶ 57}** In any event, Finton testified that prior to submitting the proposal for work to CFA, it was his "feeling *** that the way that this project was put out in a specification, that there was a likelihood that we would encounter additional volume of materials. *** [W]ithout actually excavating *** it would be very difficult to be able to determine that a hundred and forty cubic yards was the only amount of material that was going to have to be removed." He recalled "wanting to make sure that the unit price was sufficient so that if we got into additional materials found, that we were going to be able to do the work and still make money." He explained further:

"I have worked on a large number of site clean-ups where materials are to be removed, and I'm aware of a lot of others that I was not directly involved with; and I don't know of any where the specified amount of material was not exceeded in terms of remediation.

"It is very difficult when you're working with something like this circumstance where it is below ground and all you can do is do drillings in a grid pattern over the affected area to determine specifically what the volumes are that you're going to have to deal with.

"The only way to do that is to get in and actually do the excavation and keep track of what you're removing."

**{¶ 58}** Thus, irrespective of the contractual disclaimer, Enviresponse could not have justifiably relied on the estimates relative to the quantity of waste.

**{¶ 59}** As to Enviresponse's second claim, there is no allegation that anyone other than Braun represented that no additional authorization was required to remove the excess contaminated waste. Pursuant to the supplementary conditions set forth as part of the agreement between Enviresponse and CFA, the following pertinent limitations of authority were placed upon the on-site monitor:

"SC-2.1.6.1      OSM has no authority to permit or require any deviation from the Contract Documents or substitution of materials or equipment."

"SC-2.1.6.3       OSM will not advise on, issue directives relative to, or assume control over any aspect of the means, methods, techniques, sequences, or procedures unless such advice or directions are specifically required by the Contract Documents."

"SC-2.1.6.5     OSM will not accept Contractor's Work on behalf of either Consultant or Owner."

"SC-2.1.6.7    OSM has no authority to act as agent of the Consultant except as set forth herein."

**{¶ 60}** In applying the economic-loss rule to bar tort recovery in construction contract cases, the majority in *Floor Craft, supra*, was concerned that by asserting a tort claim, the contractor may try to "avoid its contract terms." *Id.*, 54 Ohio St.3d at 7, 560 N.E.2d at 212. The dissenting opinion in *Floor Craft* agreed, but felt there was no need to "disinter the privity doctrine to do this." *Id.*, 54 Ohio St.3d at 14, 560 N.E.2d at 217 (H. Brown, J., dissenting). Thus, the one point on which the majority and dissenting opinions in *Floor Craft* agree is that the contractor should not be permitted to circumvent its contract terms by virtue of labeling the action a tort.

**{¶ 61}** The limitations placed upon Braun's authority by the supplementary conditions clearly preclude Enviresponse from relying upon Braun's alleged representations regarding the lack of need for written orders. Although it appears

from the record that no one from Enviresponse had read the contract, it is nevertheless bound by its terms.

{¶ 62} Accordingly, the judgment of the court of appeals, for the reasons stated herein, is affirmed as to this issue.

{¶ 63} In light of the foregoing, the judgment of the court of appeals is reversed as to CFA and affirmed as to Lawhon, and the summary judgment entered by the trial court is reinstated.

*Judgment affirmed in part*

*and reversed in part.*

MOYER, C.J., DOUGLAS, COOK and LUNDBERG STRATTON, JJ., concur.

F.E. SWEENEY AND PFEIFER, JJ., dissent.

——————————————