[Cite as *Harder Invests., L.L.C. v. Perin-Tyler Family Found., L.L.C.*, 2025-Ohio-4706.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLERMONT COUNTY

|  |  |  |
|---|---|---|
| HARDER INVESTMENTS, LLC, | : | CASE NOS. CA2024-06-044 |
| Appellee and Cross-Appellant, | : | CA2024-06-047 |
|  | : |  |
| - vs - | : | OPINION AND |
|  | : | JUDGMENT ENTRY |
|  |  | 10/14/2025 |
| PERIN-TYLER FAMILY FOUNDATION, LLC, | : |  |
|  | : |  |
| Appellant and Cross-Appellee. | : |  |

CIVIL APPEAL FROM CLERMONT COUNTY COURT OF COMMON PLEAS
Case No. 2017 CVH 634

Rebold Larkin Murray LLC, and Kyle D. Murray, for appellee and cross-appellant.

Nichols, Speidel & Nichols, and Donald W. White, for appellant and cross-appellee.

## O P I N I O N

**BYRNE, P.J.**

{¶ 1} Plaintiff, Harder Investments, Inc. ("Harder"), and Defendant, Perin-Tyler Family Foundation ("Perin"), both appeal decisions of the Clermont County Court of

Common Pleas, General Division, on their claims and counterclaims against each other stemming from a commercial lease dispute. For the reasons discussed below, we affirm the trial court's decision in part, reverse in part, and remand for further proceedings.

## I. Factual and Procedural Background

{¶ 2} Perin owns Amelia Point, a commercial center in Pierce Township, Clermont County, Ohio. The Amelia Point commercial center contains four development parcels. One of the parcels contains a movie theater, and the other three parcels contain retail space that Perin leased to various tenants. One of those three retail-space parcels was "Lot Parcel 2," also known as the "Amelia Point Ruby Complex." The parcels contain common access roadways and other amenities.

{¶ 3} In August 2013, Perin, as commercial landlord, entered into a ten-year lease ("Lease") with Harder, as commercial tenant, for restaurant space in a five-unit commercial strip center contained within Lot Parcel 2. Harder operated a Dickey's Barbecue Pit restaurant franchise in the leased premises. Over time, various disputes arose between the parties with respect to the terms of the Lease.

## A. Background on the Parties' Key Disputes

{¶ 4} The central dispute concerned the interpretation and implementation of common area maintenance ("CAM") charges under Section 2.4 of the Lease. That section provided:

> 2.4 **CAM**. Commencing on the Rent Commencement Date, Tenant shall pay in monthly installments, as Additional Rent, its proportionate share of Common Area Maintenance ("CAM") charges covering: (i) real estate taxes, including assessments, all insurance costs, and all costs to maintain, repair, service, and replace the Common Areas; (ii) reasonable reserves for the costs of repairing, re-roofing, painting, and resurfacing the Common Areas; (iii) all costs to supervise, manage, and administer the Center which costs may include a property management fee in connection with

same and shall in any event include a fee to Landlord to supervise and administer the Center in an amount equal to ten percent (10%) of the total costs of item (i) above; and (iv) exterior utilities, maintenance, including parking areas, landscaping, and snow removal. All such CAM charges shall be in the estimated amount of $3.91 per square foot of the Premises per year (subject to adjustment at the conclusion of the Calendar Year as provided below), payable with the Fixed Minimum Rent as provided for in Paragraph 2.3 herein. Tenant shall at all times be responsible for and shall pay all municipal, county, state and federal taxes assessed against Tenant's leasehold interest in the Premises or against any personal property of any kind owned, installed or used by Tenant. Tenant's proportionate share of CAM charges shall be the ratio of the area of the Premises to the total rentable area of the Shopping Center. Landlord shall submit to Tenant by March 31 each year the actual CAM charges incurred for the Center during the prior Calendar Year, which shall be used to adjust the CAM charges to be paid by Tenant until the next adjustment. Any underpayment or overpayment of CAM for the prior Calendar Year shall be paid by or credited to Tenant with the next installment of Rent due.

{¶ 5} Section 2.4 required Harder to pay its proportionate share of various expenses incurred by Perin, including, but not limited to, real estate taxes, insurance costs, maintenance expenses, and management fees. These required payments were called "Common Area Maintenance" ("CAM") charges. While CAM charges were estimated at $3.91 per square foot annually, Section 2.4 allowed for adjustments based on actual costs. Significantly, Section 2.4(iii) provided that CAM charges would include "all costs to supervise, manage, and administer the Center which costs may include a property management fee in connection with same and shall in any event include a fee to Landlord to supervise and administer the Center in an amount equal to ten percent (10%) of the total costs of item (i) above."

{¶ 6} Problems arose in early 2014 when Harder began receiving CAM statements from Perin that it believed were incorrect. Perin presented four different CAM statements in 2014 that contained substantial errors. The initially requested CAM charges

ranged widely from $4.72 to $7.02 per square foot, exceeding the lease's $3.91 estimate. This was apparently due in part to what was later revealed to be the declining mental capacity of Joseph Perin, Sr., who was then preparing the statements. After Harder questioned the accuracy of these statements, Perin's management was transferred to Joseph Sr.'s daughter, Patricia Perin Donovan. A key point of contention was Perin's inclusion of an $11,700 annual property-management fee, which Perin charged proportionally to all tenants. This fee was separate from and in addition to the 10% supervision-and-administration fee explicitly mentioned in Section 2.4(iii). According to trial testimony, this $11,700 amount was set arbitrarily by Joseph Perin, Sr., though expert witnesses testified it aligned with market rates for third-party management services in the region.

{¶ 7} Another significant dispute arose concerning real estate taxes. The premises leased by Harder was located within "Lot Parcel 2," which contained both a developed portion and an undeveloped portion. As an element of CAM charges, Perin charged Harder for its proportionate share of real estate taxes on the entirety of Lot Parcel 2, while Harder maintained it should only pay taxes for its proportionate share of real estate taxes for the developed portion containing its premises.

### B. Harder's Claims and Perin's Counterclaims

{¶ 8} In May 2017, Harder filed suit against Perin. In its complaint, Harder brought two claims that are relevant to this appeal:[1]

---

1. Harder's Count Two also alleged that Perin violated the implied covenant of good faith and fair dealing by failing to provide actual CAM charges and refusing to consider any Lease assignment until Harder paid the unsubstantiated CAM charges. This portion of Harder's Count Two is not relevant to this appeal.

- Harder's Count One, seeking declaratory judgment regarding what Harder argued was its right to review Perin's documentation supporting CAM charges; and

- Harder's Count Two, seeking damages for Perin's breach of contract based on Perin's improper inclusion in CAM charges of (1) both the discretionary property-management fee and the 10% supervision-and-administration fee, rather than only one of those, and (2) incorrectly calculated real estate taxes.

{¶ 9} Perin counterclaimed against Harder. In its counterclaim complaint, Perin brought two claims that are relevant to this appeal:[2]

- Perin's Counterclaim One, seeking damages for Harder's breach of contract based on underpayment of rent when it refused to pay the disputed CAM charges; and

- Perin's Counterclaim Three, seeking declaratory judgment construing provisions of the Lease relating to CAM charges.[3]

## C. Summary Judgment

{¶ 10} A little less than a year later, Harder moved for summary judgment on all claims and counterclaims. The trial court denied Harder summary judgment on Harder's Count One regarding CAM documentation, but sua sponte granted summary judgment for Perin on that claim—without Perin having moved for summary judgment. The court concluded that there was no express provision in the Lease that required Perin to give

---

2. Perin voluntarily dismissed its Counterclaim Two, alleging malicious false claims and fraudulent misrepresentation.

3. Perin's Counterclaim Three also sought declaratory judgment construing provisions regarding Lease assignment and seating capacity. Those matters are not relevant to this appeal.

Harder underlying documentation supporting CAM charges. The Lease instead required Perin to give Harder only a CAM reconciliation statement containing a breakdown of all charges such that Harder could determine what the total charges were.

{¶ 11} Next, while the trial court denied Harder summary judgment with respect to the breach-of-contract claims in Harder's Count Two and the breach-of-contract counterclaims in Perin's Counterclaim One, the court resolved an interpretive dispute under the Lease. The court concluded, as a matter of law, that Section 2.4 of the Lease permitted Perin to charge Harder *both* a proportional annual property-management fee *and* the 10% supervision-and-administration fee.

### D. Trial, Post-Trial Decisions, and Objections

{¶ 12} After a lengthy discovery period, the court's magistrate presided over a three-day bench trial in June 2021 on all remaining claims and issues. The magistrate issued his post-trial decision on October 25, 2021. Perin's systematic failures to provide accurate CAM statements, noted the magistrate, created an environment of uncertainty and distrust that directly contributed to Harder's decision to withhold payment. The magistrate found in favor of Harder on two issues relevant to this appeal. First, the magistrate found that Perin improperly included the property-management fee *and* the 10% supervision-and-administration fee in Harder's CAM charges, contrary to the trial court's earlier summary-judgment determination that the Lease permitted both fees. Second, the magistrate found that Perin improperly calculated the real estate taxes portion of Harder's CAM charges. The magistrate reached this conclusion based on the understanding that the "Ruby Complex" where Harder leased the premises was only the developed portion of Lot Parcel 2, and did not include the undeveloped portion known as the Emerald Complex. In total, the magistrate found that Perin had overcharged Harder

in the amount of $10,133.60. But the magistrate also ruled for Perin, finding that Harder had underpaid administrative fees in the amount of $188.37. This resulted in a net recovery for Harder in the amount of $9,945.23.

{¶ 13} Objections were filed, and the common pleas court remanded the matter to the magistrate. On remand, the magistrate in an October 18, 2022 decision recalculated damages in light of the trial court's previous summary-judgment determination that the Lease permitted Perin to charge *both* the discretionary property-management fee and the automatic 10% supervision-and-administration fee. The magistrate concluded that the discretionary property-management fee amount of $11,700 was "cost based and not arbitrary." The magistrate then determined that Harder owed Perin $3,297.96 in unpaid CAM charges, but ultimately concluded that "because of mutual breaches of the Lease, neither party should recover on contract claims against the other." The magistrate explained that Harder breached the Lease by not paying its share of the $11,700 discretionary property-management fee over the course of several years, and Perin breached the Lease by charging Harder for real estate taxes covering both the Ruby and Emerald Complexes, rather than just the Ruby Complex.

{¶ 14} The magistrate also addressed Perin's claim for interest, late fees, and a penalty of $281,000. The magistrate noted that this amount was 85 times the $3,297.96 that Harder owed to Perin, and determined this "imbalance" to be "grossly disproportionate." The magistrate declined to order Harder to pay Perin any interest, late fees, or penalty.

{¶ 15} Both parties objected to the magistrate's October 18, 2022 decision. In a decision and entry issued on February 21, 2023, the common pleas court overruled both parties' objections. The court upheld the magistrate's numerical calculations, but found

that "to the extent that the Magistrate determined that neither party was entitled to recovery because of mutual breaches of the lease, the Court hereby modifies that finding." The court then determined that Harder owed damages of $3,297.96 to Perin.

{¶ 16} The court also agreed with the magistrate's decision not to award late fees, interest, or penalties, noting that the requested $281,000 amount was "unconscionable." The court noted that both parties had breached the Lease and that Harder's breach partially resulted from Perin's breach.

{¶ 17} Both parties subsequently moved for attorney's fees under the Lease's fee-shifting provision. On May 17, 2024, the trial court found that both parties were "prevailing parties" under the fee-shifting provision, effectively denying fees to both sides.

{¶ 18} Harder and Perin both appealed.

## II. Analysis

{¶ 19} The parties' cross-appeals challenge the trial court's interpretation of the Lease and its determination of damages. At issue are five key determinations made by the trial court:

(1) Harder challenges the summary-judgment determination that the Lease permitted Perin to charge a discretionary property-management fee in addition to the automatic 10% supervision-and-administration fee and the later, post-trial finding that Perin properly charged an $11,700 discretionary property-management fee;

(2) Harder challenges the summary-judgment determination that Perin was not required by the Lease to provide Harder with documentation of all CAM charges;

(3) Perin challenges the post-trial allocation of real-estate-tax

liability;

(4) Perin challenges the post-trial denial of penalties and

interest; and

(5) Both parties challenge the post-trial conclusion that each

party is a prevailing party, which precluded any award of

attorney fees under the Lease's fee-shifting provision.

All these challenges involve the interpretation and construction of the terms of the Lease.

## A. Contract Interpretation and Construction

{¶ 20} Our analysis begins with the foundational principles of contract interpretation. The interpretation of contractual terms presents a question of law that we review de novo. *Nationwide Mut. Fire Ins. Co. v. Guman Bros. Farm*, 73 Ohio St.3d 107, 108, 1995-Ohio-214.

{¶ 21} "The role of courts in examining contracts is to ascertain the intent of the parties." *St. Marys v. Auglaize Cty. Bd. of Commrs.*, 2007-Ohio-5026, ¶ 18, citing *Hamilton Ins. Servs., Inc. v. Nationwide Ins. Companies*, 86 Ohio St.3d 270, 1999-Ohio-16. That intent manifests through the contract's language itself. *Shifrin v. Forest City Ents., Inc.*, 64 Ohio St.3d 635, 638, 1992-Ohio-28. This focus on the text requires an examination of the agreement holistically, interpreting each provision not in isolation but as part of an integrated whole. *Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facilities Auth.*, 78 Ohio St.3d 353, 361, 1997-Ohio-202.

{¶ 22} Where the contractual language speaks with clarity, a court's role is straightforward: apply the contract's terms as written and refrain from supplementing the agreement with other terms or requirements. *See Aultman Hosp. Assn. v. Community*

- 9 -

*Mut. Ins. Co.*, 46 Ohio St.3d 51, 53 (1989). But when the text is reasonably susceptible to multiple interpretations—that is, when genuine ambiguity exists—the inquiry necessarily broadens. In such cases, the court may consider extrinsic evidence to illuminate the parties' intent, including the circumstances surrounding the agreement's formation and the parties' subsequent course of performance. *Graham v. Drydock Coal Co.*, 76 Ohio St.3d 311, 313-314, 1996-Ohio-393.

**B. The Property-Management Fee**

{¶ 23} Harder's first assignment of error states:

> THE TRIAL COURT ERRED IN DETERMINING THAT THE LEASE ALLOWED PERIN TO COLLECT A SEPARATE, ARBITRARY SELF-MANAGEMENT FEE, ABOVE AND BEYOND THE 10% OF COSTS PROVIDED IN THE LEASE, WHEN PERIN INCURRED NO ACTUAL COST FOR MANAGEMENT.

{¶ 24} As previously described, Section 2.4 of the lease governs CAM charges. On summary judgment, the trial court determined that Section 2.4(iii) allows for two fees: (1) a discretionary property-management fee, and (2) an automatic 10% supervision-and-administration fee. Later, with regard to the discretionary property-management fee, the court adopted the magistrate's finding that Perin was entitled to charge such a fee in the amount of $11,700, even though no contemporaneous documentation supported the specific components of this fee. Harder's first assignment of error challenges both determinations. We will address these arguments in turn.

**1. May Perin Charge Both Fees?**

{¶ 25} Section 2.4 states that Harder must pay a proportionate share of CAM charges, which include multiple components. Section 2.4(iii) describes one of those components as "all costs to supervise, manage, and administer the Center." It further breaks "all costs" into two sub-components. First, Section 2.4(iii) states that these costs

"*may* include a property management fee in connection with same." (Emphasis added.). "*[A]nd*," Section 2.4(iii) states, these costs "*shall* in any event include a fee to Landlord to supervise and administer the Center in an amount equal to ten percent (10%) of the total costs of item (i) above." (Emphasis added.). The reference to the "total costs of item (i) above" is a reference to "real estate taxes, including assessments, all insurance costs, and all costs to maintain, repair, service, and replace the Common Areas." The provision's structure—particularly its use of "and" to separate these clauses and its contrasting language of "may" versus "shall"—makes clear that both fees are authorized and suggests these fees serve different purposes. The automatic 10% supervision-and-administration fee is explicitly tied to the landlord's supervisory role and is calculated based on item (i) costs. The phrase "shall in any event" creates a floor, guaranteeing the 10% fee regardless of Perin's actual property-management expenditures.

{¶ 26} Harder advances a narrow reading of Section 2.4(iii), contending that Perin may charge the discretionary property-management fee only when incurring out-of-pocket property-management expenses owed to third parties, not when performing these services in-house. We disagree with this restrictive interpretation. It has no support in the text of Section 2.4(iii). Section 2.4(iii) refers to "*all* costs to supervise, manage, and administer the Center," and states that these costs "may include a property management fee in connection with same," but does not distinguish between costs payable to third parties and in-house costs. (Emphasis added.). When interpreting a contract, we may not insert words not found in the text. *LublinSussman Group LLP v. Lee*, 2018-Ohio-666, ¶ 19 (6th Dist.) (stating that "the court must give effect to the words used in the contract, and not delete or insert words"), citing *Cleveland Elec. Illum. Co. v. Cleveland*, 37 Ohio St.3d 50, 53 (1988). Having reached this conclusion based on the unambiguous language

of Section 2.4(iii), no further analysis of the terms of the Lease is necessary with respect to whether the discretionary property-management fee may include costs associated with services provided in-house. *See Sunoco, Inc. (R & M) v. Toledo Edison Co.*, 2011-Ohio-2720, ¶ 37 ("When the language of a written contract is clear, a court may look no further than the writing itself to find the intent of the parties.").

{¶ 27} But Harder also raises a broader argument about potential double recovery that merits serious consideration. The functions described in the discretionary property-management-fee and the automatic 10% supervision-and-administration-fee provisions substantially overlap: the discretionary property-management fee encompasses supervision, administration, and management, while the automatic 10% fee covers supervision and administration. Thus both fees address supervision and administration. This overlap, combined with the absence of any requirement to document actual management costs, creates a troubling possibility: Perin could potentially charge and receive compensation for both the automatic 10% supervision-and-administration fee and additional compensation for property-management services (per the discretionary property-management fee) that encompass essentially identical responsibilities. Such an arrangement could effectively compensate Perin twice for the same managerial functions.

{¶ 28} Harder's argument, then, concerns a fundamental question: Did the parties intend to create a framework that could result in this kind of double recovery? The answer requires a careful examination of the relationship between these two fee provisions and their place within the broader economic structure of the Lease.

{¶ 29} The double-recovery analysis requires a nuanced understanding of economic costs. As the magistrate aptly recognized, economic cost comprises two distinct components: explicit costs and implicit costs. *In re Perry Cty. Foods, Inc.*, 313

B.R. 875, 901 (Bankr.N.D.Ala. 2004). Explicit costs, the more familiar category, arise from direct monetary payments. *Iowa Util. Bd. v. Fed. Communications Comm.*, 219 F.3d 744, 752, fn. 5 (8th Cir. 2000) ("Explicit costs are those costs incurred when a monetary payment is made."), *vacated in part on other grounds*, 301 F.3d 957 (8th Cir. 2002). These include readily quantifiable expenses like raw materials, labor, and other operating costs. *In re Perry Cty. Foods* at 901. Implicit costs, by contrast, represent the value of resources deployed without immediate monetary exchange. *Iowa Util. Bd.* at 752, fn. 6, citing Roger A. Arnold, *Economics*, at 484-485 (2d Ed. 1992). These opportunity costs emerge when a business directs internal resources toward specific activities, thereby foregoing alternative uses of those resources. *In re Perry Cty. Foods* at 901 (noting that normal profit calculations include "implicit costs such as the value of the time devoted to the business by its owners"). While implicit costs lack the tangible paper trail of their explicit counterparts, they represent equally real economic burdens.

{¶ 30} The evidence in this case shows that Perin's property-management activities generated both explicit and implicit costs (though what the evidence shows on this matter is not strictly necessary for our analysis of the Lease terms). Even without third-party management expenses, Perin incurred substantial implicit costs: allocation of internal staff time, overhead associated with property-management functions, administrative expenses for tenant relations and maintenance coordination, supervision of contractors, and maintenance of management systems. These resource commitments, though not reflected in direct monetary outlays, represented genuine economic costs that Perin could have otherwise directed toward alternative profitable ventures.

{¶ 31} Viewed through this economic lens, the Lease's fee structure, allowing both an automatic 10% fee and a discretionary property-management fee, may well

compensate different aspects of Perin's total property-management burden. When Perin opts for in-house management over third-party services, it assumes real economic costs through the commitment of resources that could otherwise be deployed elsewhere. The absence of explicit costs does not diminish the reality or recoverability of these economic burdens under the Lease.

{¶ 32} Harder advances yet another argument focused on the purportedly arbitrary nature of the discretionary property-management fee. This challenge rests on Section 2.4's requirement that Perin "submit to Tenant by March 31 each year the *actual CAM charges incurred* for the Center during the prior Calendar Year." (Emphasis added.). The $11,700 discretionary property-management fee, Harder contends, lacked documentary support or cost-based calculation, appearing instead to represent an arbitrary figure determined by Joseph Perin, Sr. Invoking traditional principles of contract interpretation, Harder argues that our interpretation must give effect to all contractual provisions rather than render them meaningless. In Harder's view, permitting Perin to assess fees without demonstrating actual costs would effectively nullify the above-quoted requirement.

{¶ 33} We find this argument unconvincing. Our interpretation harmonizes all provisions of Section 2.4(iii) while acknowledging the economic realities of property management. The Lease's requirement for Perin to annually submit "actual CAM charges incurred" to Harder did not necessarily demand line-item accounting of internal expenses. Rather, it required that the charges reflect genuine economic costs, both explicit and implicit, associated with property management. When Perin provided management services internally at market rates, particularly when those rates were demonstrably reasonable, such charges satisfy the Lease's requirement. This reading gives practical effect to all contractual provisions while avoiding an overly restrictive interpretation that

would unfairly disadvantage Perin, which chose to manage its property directly, rather than through a third-party management service.

{¶ 34} We find no error in the trial court's determination that the Lease permitted Perin to charge both the discretionary property-management fee and the automatic 10% supervisions-and-administration fee.

### 2. Was the $11,700 Fee Permissible?

{¶ 35} As mentioned above, Harder also challenges the reasonableness of the $11,700 discretionary property-management fee charged by Perin. Upon our review of the record, we find that the record before us amply supports both the reasonableness of the $11,700 fee and the substantiality of the services rendered. The magistrate's detailed findings paint a picture of hands-on management by Perin family members, encompassing a broad spectrum of essential services: bill payment, contractor oversight, repair execution, rent collection, and various administrative responsibilities. Expert testimony confirmed that the $11,700 fee aligned with prevailing market rates for comparable third-party management services. Perhaps most tellingly, Harder's own witness conceded that outsourcing these functions could command fees up to $25,000—more than twice the amount Perin charged.

{¶ 36} We conclude that the trial court properly permitted Perin to assess the $11,700 discretionary property-management fee in addition to the automatic 10% supervision-and-administration fee.

{¶ 37} We overrule Harder's first assignment of error.

### C. Documentation Supporting CAM Charges

{¶ 38} Harder's second assignment of error states:

> THE TRIAL COURT ERRED IN FINDING THAT HARDER IS
> NOT ENTITLED TO UNDERLYING DOCUMENTATION FOR

CAM CALCULATIONS AT SUMMARY JUDGMENT.

{¶ 39} The trial court granted summary judgment to Perin on Harder's Count One, which sought declaratory relief regarding CAM-charges documentation. In its second assignment of error, Harder challenges the trial court's grant of summary judgment to Perin on this claim. Harder rests its challenge on two grounds.

{¶ 40} First, Harder contends that the trial court improperly awarded summary judgment to Perin sua sponte, without the predicate of a formal motion from Perin seeking such relief. Second, and more fundamentally, Harder argues that genuine issues of material fact precluded summary judgment in Perin's favor on the merits.

{¶ 41} The controversy centers on the following provision in Section 2.4 of the Lease: "Landlord shall submit to Tenant by March 31 each year the actual CAM charges incurred for the Center during the prior Calendar Year." According to Harder, this contractual obligation demanded more than the mere CAM reconciliation statements that Perin furnished; it also required production of underlying documentation substantiating those CAM charges. The adequacy of notice—specifically, whether Perin's reconciliation statements sufficiently informed Harder of the actual charges—lies at the core of this dispute.

**1. Sua Sponte Summary Judgment to Perin**

{¶ 42} We begin with Harder's procedural challenge to the trial court's grant of summary judgment in Perin's favor. While Ohio law generally constrains courts from entering summary judgment for non-moving parties, this constraint is not absolute. The Ohio Supreme Court has recognized that a court may grant summary judgment to a non-movant when three essential conditions converge: "[1] all relevant evidence is before the court, [2] no genuine issue as to any material fact exists, and [3] the non-moving party is

entitled to judgment as a matter of law." (Cleaned up.) *Todd Dev. Co. v. Morgan*, 2008-Ohio-87, ¶ 16. This authority comes with a procedural safeguard: the party facing adverse judgment must have enjoyed a full and fair opportunity to be heard. *Id*. at ¶ 17.

{¶ 43} The record before us demonstrates that these requirements were satisfied. The central question presented in both Harder's Claim One and Perin's Counterclaim Three centered on contract interpretation, specifically, whether the Lease's requirement that Perin provide "actual CAM charges" carries with it an implicit obligation to produce supporting documentation. Far from being blindsided by this issue, Harder itself set the issue squarely before the court through its own motion for summary judgment. The relevant evidence (principally the Lease agreement) was fully before the court, and Harder exercised its opportunity to advance its interpretation of the Lease's requirements through comprehensive briefing and oral argument.

{¶ 44} Most significantly, the interpretation of "actual CAM charges" presented a pure question of law amenable to resolution through established principles of contract interpretation. The meaning of this phrase did not turn on disputed facts or competing evidence; it required only the application of legal principles to uncontested contractual language. In these circumstances, where the dispositive question was purely legal and both parties had fully aired their positions, the trial court acted within its authority in granting summary judgment to Perin. *See id.* at ¶ 16.

**2. Obligation to Produce CAM-Charge Documentation**

{¶ 45} Turning to the merits of Harder's declaratory-judgment claim, we conclude that the trial court correctly determined that the Lease created no implicit obligation for Perin to produce documentation supporting specific CAM charges. The text of the Lease agreement is dispositive on this point.

{¶ 46} Section 2.4 of the Lease established a straightforward reporting framework: Perin "shall submit to Tenant by March 31 each year the actual CAM charges incurred for the Center during the prior Calendar Year," which submission then served to "adjust the CAM charges to be paid by Tenant until the next adjustment." While the Lease meticulously defined both the scope of CAM charges (encompassing maintenance, repairs, insurance, and taxes) and their calculation method based on the tenant's proportionate share of rentable area, it notably omitted any requirement for supporting documentation, receipts, or detailed breakdowns. As the trial court aptly observed, had the parties intended to create such a documentation requirement, they could have readily included it in the Lease's provisions.

{¶ 47} Harder's reliance on *Upper Krust S., Inc. v. School Emps. Retirement Bd. of Ohio*, 1996 Ohio App. LEXIS 1176 (2d Dist. Mar. 29, 1996), is misplaced. That case, while superficially similar, presented a fundamentally different problem. There, the new management company of the School Employees Retirement Board of Ohio ("SERBO") had restructured its accounting categories, making it impossible for Upper Krust, the tenant, to identify which charges fell within the contractually specified categories of parking lot expenses it was required to pay. *Upper Krust* at *5, 31. The court's narrow remedy of requiring audited statements addressed this specific impairment of basic contract performance. *Id*. at *32-33. It did not, as Harder suggests, establish a broader principle requiring lessors to provide underlying documentation for CAM charges.

{¶ 48} Indeed, *Upper Krust*'s holding was explicitly tethered to the practical necessity of proper expense categorization. The court required SERBO to "provide Upper Krust with a statement breaking down the charges for the five types of parking lot CAM expenses that it is required to pay so that Upper Krust could comply with its contractual

obligations." *Id.* at *33. This remedy stemmed from the court's authority to supply implied terms "'indispensable to effectuate the intentions of the parties, without which the contract itself could not be performed.'" *Id.*, quoting *Williams v. Goodyear Aircraft Corp.*, 84 Ohio App. 113, 118 (9th Dist. 1948). Such is not the case here.

{¶ 49} Harder's argument that the phrase "actual CAM charges" is ambiguous fails to persuade. The term "actual" carries its ordinary meaning: "[e]xisting in fact; real" as distinguished from estimated or projected charges. *Black's Law Dictionary* (12th Ed. 2024). Nothing in this commonplace term suggests an implicit documentation requirement, and we decline to read one into the Lease.

{¶ 50} Our interpretation does not leave tenants defenseless against potential CAM overcharges. They retain their right to challenge whether specific charges were incurred or properly apportioned, as Harder has done here. But the Lease's requirement of "actual CAM charges" demands only that Perin provide an accurate accounting of charges incurred, not that it produce a paper trail for each charged expense.

{¶ 51} Accordingly, we conclude that the trial court properly granted summary judgment to Perin on the issue of CAM-charge documentation.

{¶ 52} We overrule Harder's second assignment of error.

### D. Apportionment of Real Estate Taxes

{¶ 53} Perin's first assignment of error states:

> THE MAGISTRATE'S AND TRIAL COURT'S DECISION TO REDUCE HARDER'S CAM RESPONSIBILITY BY DIVIDING THE PLATTED LOT/PARCEL WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 54} This assignment of error concerns the magistrate's and trial judge's analyses of whether Perin erred in calculating Harder's proportionate share of Perin's real estate taxes under the Lease.

{¶ 55} This assignment of error presents a question of contract interpretation: whether the Lease permits allocating real estate taxes based on a division of Lot Parcel 2 into developed and undeveloped components, rather than treating the parcel as an indivisible whole.

### 1. The Reasoning in the Trial Court

{¶ 56} As an element of CAM charges, Perin charged Harder for Harder's proportionate share of the real estate taxes on 100% of Lot Parcel 2. The magistrate held that Perin overcharged Harder and should have instead charged Harder for Harder's proportionate share of Perin's real estate taxes on only the developed portion of Lot Parcel 2 in which Harder's leased premises was located.[4]

{¶ 57} In analyzing the parties' arguments about real estate taxes, the magistrate looked to the language of the Lease, but also discussed—and apparently considered—testimony about how the county treasurer taxed the entirety of Lot Parcel 2, testimony about how a landscaping company mowed the grass on all of Lot Parcel 2 in one service call and issued one fee for the work until Perin asked it to split the fee, and testimony about Perin's internal use of the term "Emerald Complex" to refer to the undeveloped portion of Lot Parcel 2 and the term "Ruby Complex" to refer to the developed portion. The magistrate also stated that "The absence of specific language in the lease stating that 'taxes' means taxes on both parcels should be construed against the drafter of the lease," which was Perin.

---

4. To be clear, the magistrate determined that the developed portion of Lot Parcel 2 was 49.39% of the total. Thus, the magistrate determined that Harder should pay its *proportionate share of 49.39%* of the Lot Parcel 2 real estate taxes; the magistrate did *not* determine that Harder should pay 49.39% of the total Lot Parcel 2 real estate taxes. In other words, the magistrate found that Harder was responsible for *less* than 49.39% of the Lot Parcel 2 real estate taxes.

**{¶ 58}** The trial judge, reviewing Perin's objections to the magistrate's decision, found no error with respect to real estate taxes. The judge relied on the text of the Lease, the "evidence in the record," and Daniel Harder's testimony about which portion of the premises should have been considered for real estate tax calculation purposes.

### 2. Perin's Argument on Appeal

**{¶ 59}** On appeal, Perin challenges the court's decision to divide Lot Parcel 2 into separately developed "Ruby Complex" and undeveloped "Emerald Complex" portions for purposes of calculating real estate taxes as an element of CAM charges. Perin argues this division was arbitrary and unsupported by evidence, contending that the Lease contemplated CAM charges including Harder's proportionate share of real estate taxes based on the *entire*, undivided Parcel 2 as described in the Lease's legal description and consistently billed by the county treasurer. Perin maintains that no survey, legal description, or credible evidence supported the trial court's decision to divide what has always been treated as a single tax parcel, and that the court's erroneous division substantially reduced Harder's legitimate CAM obligations in contravention of the Lease terms.

### 3. Contractual Analysis of the Lease's Terms

**{¶ 60}** Perin's challenge presents a straightforward question of contract interpretation: whether the Lease permits dividing Lot Parcel 2 into developed and undeveloped portions when calculating the real estate tax portion of CAM charges. We must therefore apply the fundamental principles of contract interpretation. The paramount objective in contract interpretation is to effectuate the parties' intent, which we discern from the plain and ordinary meaning of the contractual language unless the agreement clearly signals a different meaning. *Transtar Elec., Inc. v. A.E.M. Elec. Servs. Corp.*, 2014-

Ohio-3095, ¶ 9. When confronted with clear contractual terms, our inquiry extends no further than the document itself. *Id*. So our analysis here begins with the text of the Lease.

**{¶ 61}** Section 2.4 of the Lease establishes the framework for calculating CAM charges. It requires Harder to pay "its proportionate share" of various expenses, including "real estate taxes, including assessments," along with insurance costs, maintenance expenses, and management fees. Section 2.4(i)-(iv). The provision defines "proportionate share" as "the ratio of the area of the Premises to the total rentable area of the Shopping Center."

**{¶ 62}** The definition of "proportionate share" incorporates two terms that the Lease separately defines in the "DEFINITIONS" section: "Premises" and "Shopping Center." Understanding these definitions is essential to resolving the parties' dispute.

**{¶ 63}** "Premises" refers specifically to Harder's leased space:

> "Premises" shall mean that certain space approximately 2,450 square feet (subject to confirmation by measurement as provided below) situated in the Amelia Point Ruby Complex and commonly known as Unit 5, 1221 SR 125, Amelia, Ohio. The approximate location and boundaries of the Premises are shown in the attached <u>Exhibit A.</u>

**{¶ 64}** "Shopping Center" refers to the entire Amelia Point Ruby Complex:

> "Shopping Center" shall mean the Amelia Point Ruby Complex, as depicted in the attached <u>Exhibit A</u> ("Ruby Complex"), which is real property in Pierce Township, Clermont County, Ohio, being more particularly described in the attached <u>Exhibit A-1</u>.

**{¶ 65}** Both definitions refer to Exhibit A, the site plan attached to the Lease:



We note four key points about the site plan. First, it depicts a development with two sections of roughly equal size. The western half is designated "FUTURE DEVELOPMENT," while the eastern half shows five developed retail units. Second, Harder's "premises," Unit 5, appears near the center of the site plan on the western edge of the retail units, marked by diagonal lines and labeled "Dickey's BBQ." Third, the Lease's definition of "Shopping Center" describes the entire area depicted in Exhibit A as the "Amelia Point Ruby Complex." Nothing in the definition suggests any subdivision or distinction between developed and undeveloped portions. Under the Lease, then, everything shown in the site plan is part of the Amelia Point Ruby Complex.

{¶ 66} The definition of "Shopping Center," or "Amelia Point Ruby Complex," states that the property is "more particularly described" in Exhibit A-1, which provides a

typewritten metes and bounds legal description of 2.114 acres.[5] Exhibit A-1 refers to this property both as the "Ruby Complex" and as "Lot Parcel 2," making these terms synonymous with "Shopping Center" and "Amelia Point Ruby Complex." Exhibit A-1 is reproduced below:

**EXHIBIT A-1**
**LEGAL DESCRIPTION OF RUBY COMPLEX**
**[SEE ATTACHED LEGAL DESCRIPTION]**

Subject:     Description of Real Estate           10/15/09
            Lease Parcel 2
            1.984 acres

EXHIBIT A-1     LOT-PARCEL 2
                      RUBY and EMERALD COMPLEXES

Commencing at a stone found at the northeast corner of lot 39 of Arcadia Subdivision Second Addition as recorded in Plat Book "E", page 96 Clermont County Recorder's Office; Said stone found being in the west line of a 1.278 acre tract now owned by Robert W. & Jane Cantoni as recorded in Deed Book 760, page 481 of the Clermont County Recorder's Office.
Thence with Robert W. & Jane Cantoni's west line N 37°21'47" E a distance of 222.47' to a ½" iron pin found on the south right of way of State Route 125.
Thence with the south right of way of State Route 125 N 48°14'38" W a distance of 288.41 feet to a point. Said point being the true point of beginning for the tract herein described; Said point being the most easterly point for the tract herein described.
Thence with a severance through said Perin Tyler Family Foundation LP's 11.140 acre tract the following thirteen (13) courses:

1) S 41°49'40" W a distance of 142.45 feet to a point.
2) 47.49 feet along a circular curve to the right, having a radius of 24.79 feet and being subtended by a chord bearing of S 70°11'16" W and a chord distance of 40.56 feet to a point.
3) N 84°08'20" W a distance of 51.80 feet to a point.
4) 18.85 feet along a circular curve to the right, having a radius of 12.00 feet and being subtended by a chord bearing of N 39°08'20" W and a chord distance of 16.97 feet to a point.
5) N 05°51'40" E a distance of 33.48 feet to a point.
6) 80.16 feet along a circular curve to the left, having a radius of 85.00 feet and being subtended by a chord bearing of N 21°09'20" W and a chord distance of 77.22 feet to a point.
7) N 48°10'20" W a distance of 140.51 feet to a point.
8) 53.36 feet along a circular curve to the left, having a radius of 85.00 feet and being subtended by a chord bearing of N 66°09'20" W and a chord distance of 52.49 feet to a point.
9) N 84°08'20" W a distance of 28.11 feet to a point.
10) 16.49 feet along a circular curve to the right, having a radius of 10.50 feet and being subtended by a chord bearing of N 39°08'20" W and a chord distance of 14.85 feet to a point.
11) N 05°51'40" E a distance of 113.69 feet to a point.
12) 45.81 feet along a circular curve to the right, having a radius of 73.50 feet and being subtended by a chord bearing of N 23°42'52" E and a chord distance of 45.07 feet to a point.
13) N 41°34'04" E a distance of 59.28 feet to a point in the south right of way of said State Route 125.

{¶ 67} The copy of Exhibit A-1 in the record contains handwritten notations stating "EXHIBIT A-1," "LOT-PARCEL 2," and "RUBY and EMERALD COMPLEXES." Testimony

---

5. Exhibit A-1 actually states that Parcel 2 contains 1.984 acres, but the parties agree the actual size is 2.114 acres. This discrepancy is not relevant to the issues on appeal.

at trial established that within Perin's business operations, they informally used "Ruby Complex" to refer to the developed portion and "Emerald Complex" to refer to the undeveloped portion of Lot Parcel 2. But this internal nomenclature appears nowhere in the typewritten text of the Lease. The Lease refers only to the entire Shopping Center or Lot Parcel 2 as the "Amelia Point Ruby Complex."

{¶ 68} Nothing in the record suggests the handwritten notations existed on Exhibit A-1 when the parties executed the Lease. Neither party could explain how or when the handwriting appeared on the document. We therefore treat the handwritten additions as subsequent, unauthorized modifications that cannot alter the Lease's meaning. This conclusion follows from the terms of the Lease itself. Section 14.9 of the Lease states that the Lease may be modified only "by an instrument in writing executed by the parties hereto." Section 14.14 similarly requires that amendments be "executed by the parties." Because the record contains no evidence that both parties executed any document adding these handwritten words to the Lease, the notations form no part of the binding agreement and must be ignored in our analysis. *See Wells Fargo Bank, N.A. v. Baldwin*, 2012-Ohio-3424, ¶ 18 (12th Dist.) ("A contract cannot be unilaterally modified, and parties to a contract must mutually consent to a modification."), citing *Hanna v. Groom*, 2008-Ohio-765, ¶ 27 (10th Dist.).

{¶ 69} Having identified the relevant definitions, we return to Section 2.4's formula: Harder's "proportionate share" of CAM charges equals "the ratio of the area of the Premises to the total rentable area of the Shopping Center." This formula contains one additional phrase requiring interpretation: "total rentable area." The Lease does not define this term. When a contract leaves a term undefined, we give the term its "ordinary meaning unless manifest absurdity results, or unless some other meaning is clearly

evidenced from the face or overall contents of the agreement." (Cleaned up.) *Deerfield Twp. v. Mason*, 2013-Ohio-779, ¶ 16 (12th Dist.).

{¶ 70} The ordinary meaning of "total rentable area" is easy to discern. It refers to those portions of Lot Parcel 2 capable of being leased to commercial tenants. Exhibit A makes clear that only the five-unit commercial strip on the eastern side of Lot Parcel 2 is rentable space. The western portion marked "FUTURE DEVELOPMENT" contains no structures available for lease.[6] The total rentable area therefore equals approximately 9,425 square feet (the sum of the square footages of each of the units shown on Exhibit A). Harder's 2,450 square foot premises comprises 26% (rounded for simplicity) of this total.

{¶ 71} The straightforward application of Section 2.4's formula produces this result: Harder must pay 26% of all CAM charges. CAM charges, in turn, include real estate taxes on the Shopping Center. And the Shopping Center, as we have shown, means all of Lot Parcel 2 as described in Exhibits A and A-1. The Lease contains no provision authorizing treatment of real estate taxes differently from any other CAM expenses. Nor does it permit dividing Lot Parcel 2 for tax allocation purposes while treating the parcel as a whole for other purposes.

{¶ 72} The definition of "Common Areas" in Section 1.1 of the Lease reinforces this conclusion. Common Areas include "the parking areas, service roads, loading facilities and sidewalks shown and depicted in Exhibit A, and other facilities as may be designated from time to time by Landlord." Section 2.4(i) specifies that CAM charges cover "real estate taxes, including assessments, all insurance costs, and all costs to

---

6. We note that this reading of the Lease's text, including Exhibit A, is consistent with ample testimony in the record.

maintain, repair, service, and replace the Common Areas." In other words, CAM charges represent the aggregate costs of operating and maintaining all of Lot Parcel 2. The tenants who lease space on Lot Parcel 2 collectively bear these costs. Each tenant's share is determined by the proportion of total available space that tenant occupies. Harder leases 26% of the available space and therefore pays 26% of the total CAM costs.

{¶ 73} This textual analysis resolves the issue. The Lease unambiguously requires calculating Harder's proportionate share of real estate taxes based on the entire 2.114-acre Lot Parcel 2, not merely its developed eastern half. Because the contractual language is clear, our inquiry properly extends no further. *Shifrin*, 64 Ohio St.3d at 638 ("If no ambiguity appears on the face of the instrument, parol evidence cannot be considered in an effort to demonstrate such an ambiguity.").

### 4. The Improper Consideration of Extrinsic Evidence

{¶ 74} The magistrate and trial judge took a different approach. While they examined the Lease's text, they evidently did not examine the phrase "total rentable area" as we have done. More significantly, they relied on extrinsic evidence in construing the Lease's terms. This evidence included marketing materials distinguishing between an Emerald Complex and a Ruby Complex, testimony about the county treasurer's billing practices for Lot Parcel 2's taxes, testimony about a mowing company billing for work performed on Lot Parcel 2, and testimony about Perin's internal use of the "Emerald" and "Ruby" nomenclature.

{¶ 75} This reliance on extrinsic evidence was error. The law is clear: courts may consider extrinsic evidence only when contractual language is genuinely ambiguous or when special circumstances imbue particular terms with unique meaning. *Kelly v. Med. Life Ins. Co.*, 31 Ohio St.3d 130, 132 (1987). Neither exception applies here. As

demonstrated above, the Lease's terms regarding real estate tax allocation are unambiguous when read in accordance with their plain meaning and in the context of the full agreement. Nor did special circumstances create any technical or specialized meaning for the terms at issue. The trial court therefore erred in looking beyond the Lease's text.

### 5. Conclusion

{¶ 76} The Lease's plain language mandates calculating Harder's proportionate share of real estate taxes based on the entire 2.114-acre Lot Parcel 2 as defined in Exhibits A and A-1. While Exhibits A and A-1 acknowledge that Lot Parcel 2 contains both developed and undeveloped components, the Lease provides no basis for treating these components as separate properties for purposes of allocating real estate taxes. To adopt Harder's reading would require us to insert terms into the agreement that the parties did not include, effectively rewriting their bargain to favor one party over the other. This we cannot do.

{¶ 77} We sustain Perin's first assignment of error.

### E. Penalties and Interest for Breach

{¶ 78} Perin's second assignment of error alleges:

> THE TRIAL COURT ERRED IN FINDING THAT PERIN WAS NOT ENTITLED TO PENALTIES AND INTEREST PURSUANT TO THE LEASE.

{¶ 79} Perin argues in its second assignment of error that the trial court erred when it denied Perin's claim for penalties and interest on unpaid CAM charges. Through its counterclaim for breach of contract, Perin sought approximately $281,000 in penalties and interest under Section 2.5 of the Lease for Harder's alleged underpayment of rent. The court, however, found these penalties "unconscionable" and denied them, concluding

that the roughly 85-to-1 ratio between the penalty amount and Harder's actual CAM underpayment of $3,297.96 was grossly disproportionate, particularly given that both parties had breached the Lease. Section 2.5 of the Lease provides:

> If Tenant shall fail to pay any Rent on or before its due date, then Tenant shall be assessed a late fee of five percent (5%) of the amount due each month until paid in full. Any unpaid amounts shall also bear interest in the amount of one and one-half percent (1 1/2%) per month, or the maximum allowed by the laws of the state in which the Shopping Center is located, whichever is less. Tenant shall also be obligated to pay to Landlord all expenses reasonably attendant upon the collection of any such past due rents or charges, including, but not limited to, court costs and attorneys' fees.

{¶ 80} Perin contends that the trial court improperly considered the parties' mutual breaches and the proportionality of the penalties in denying what it characterizes as mandatory contractual remedies. We agree with the trial court's determination.

{¶ 81} Although Ohio law generally respects parties' freedom to structure their contractual relationships, including damages provisions, this freedom is not unlimited. *See Unifirst Corp. v. Yusa Corp.*, 2003-Ohio-4463, ¶ 30 (12th Dist.). The critical distinction lies between legitimate liquidated damages, which courts will enforce, and impermissible penalties, which they will not. *Lake Ridge Academy v. Carney*, 66 Ohio St.3d 376, 381 (1993). This distinction reflects contract law's foundational purpose: to compensate parties for actual losses, not to punish breaches. *See id.* (punitive damages generally are not recoverable for breach of contract "[b]ecause the sole purpose of contract damages is to compensate the nonbreaching party for losses suffered as a result of a breach"). Indeed, absent independent tortious conduct, contract law eschews punishment altogether. *Id*. Accordingly, while parties have considerable freedom to contract, courts retain the equitable power to decline enforcement of penalties that would be

unconscionable under particular circumstances. *See Samson Sales, Inc. v. Honeywell, Inc.*, 12 Ohio St.3d 27, 28-29 (1984).

{¶ 82} The circumstances here present an example of an unenforceable penalty. Several factors compel this conclusion. First, the sheer magnitude of the disparity— penalties approximately 85 times Harder's actual underpayment—bears no reasonable relationship to any conceivable actual damages. *See id.* at 29 (requiring reasonable relationship between liquidated damages and actual harm). Second, both parties breached the Lease, with the trial court specifically finding that "[Harder's] breach was partially a result of [Perin's] breach." The payment disputes arose from Perin's own errors in CAM calculations, stemming from the declining cognitive health of Joseph Perin, Sr. These erroneous charges naturally bred distrust and dispute. While Section 2.5's penalty provisions are not unconscionable per se, their application must be considered in light of the broader circumstances. In the unique circumstances here, the application of Section 2.5 would act as an unconscionable penalty.

{¶ 83} Perin contends that Harder could have avoided these penalties by paying under protest or seeking earlier declaratory judgment. But this argument overlooks both practical reality and sound policy. It would effectively punish commercial tenants for raising legitimate challenges to incorrect charges in a non-litigation context—a result that would chill meaningful dispute resolution in landlord-tenant relationships. Moreover, Perin itself could have prevented this dispute through accurate CAM calculations or clearer documentation.

{¶ 84} Our holding does not undermine the general enforceability of contractual late fees or interest charges. Rather, we conclude only that under these specific circumstances—where both parties breached their obligations, where the landlord's own

errors sparked the payment disputes, and where the claimed penalties obscenely dwarf any actual damages—the trial court properly exercised its discretion in declining to enforce Section 2.5's penalty provisions. *See Lake Ridge Academy*, 66 Ohio St.3d at 381 (courts should examine the particular circumstances in evaluating enforceability of liquidated damages; liquidated damages must be reasonable in light of actual damages); *R.L.R. Invests., LLC v. Wilmington Horsemens Group, LLC*, 2014-Ohio-4757, ¶ 34-35 (12th Dist.) (invalidating significantly smaller proportional penalties).

{¶ 85} We find no error in the trial court's decision not to enforce the penalties and interest provision in Section 2.5 of the Lease.

{¶ 86} We overrule Perin's second assignment of error.

### F. Prevailing-Party Status

{¶ 87} Finally, we consider Harder's and Perin's competing arguments about attorney fees together.

{¶ 88} Harder's third assignment of error states:

> THE MAGISTRATE AND TRIAL COURT ERRED IN FINDING THAT BOTH PARTIES ARE PREVAILING PARTIES FOR THE PURPOSES OF DETERMINING AWARD OF ATTORNEY FEES.

{¶ 89} Perin's third assignment of error states:

> THE TRIAL COURT ERRED WHEN IT DETERMINED THAT BOTH HARDER AND PERIN WERE "PREVAILING PARTIES."

{¶ 90} Both Harder and Perin challenge the trial court's determination that neither party was entitled to attorney fees under Section 14.19 of the Lease because each prevailed on different aspects of their claims. But we conclude that these assignments of error are not ripe for our consideration, given our disposition of the other issues in this case.

{¶ 91} Our holding on Perin's first assignment of error, that the trial court erred in dividing Lot Parcel 2 for real estate tax calculations, alters the damages landscape in this case. The trial court's determination that Harder owed only $3,297.96 was predicated on the erroneous real estate tax apportionment we have rejected. When recalculated to include Harder's proportionate share of taxes on the entire parcel over the relevant period, Perin's recovery will likely increase substantially. This dramatic shift in the parties' relative success makes any current determination of prevailing-party status premature and potentially incorrect.

{¶ 92} The ripeness doctrine counsels against deciding issues where the harm asserted has not yet occurred or is speculative. *State ex rel. Jones v. Husted*, 2016-Ohio-5752, ¶ 21 (stating that a claim is not ripe for review when it is "contingent upon future events that might or might not occur"). Here, the question underlying the attorney fees determination, which party ultimately prevailed and to what extent, cannot be properly answered until the trial court completes its recalculation of real estate taxes. A prevailing-party determination made on the current incomplete record would rest on a foundation of shifting sand.

{¶ 93} We decline to reach Harder's third assignment of error and Perin's third assignment of error because they are unripe. The trial court should reconsider the attorney-fees issue after completing the recalculation of real estate taxes in accordance with this opinion.

### III. Conclusion

{¶ 94} We have overruled each of the assignments of error we have reached except for Perin's first assignment of error. We have sustained that assignment of error, holding that the trial court incorrectly calculated the CAM charges for real estate taxes.

We have declined to reach the parties' third assignments of error regarding attorney fees as unripe. Therefore, the trial court's judgment is affirmed in part and reversed in part. This case is remanded for recalculation of real estate taxes and reconsideration of attorney fees in accordance with this opinion.

HENDRICKSON and PIPER, JJ., concur.

## J U D G M E N T   E N T R Y

The assignments of error properly before this court having been ruled upon, it is the order of this court that the judgment or final order appealed from be, reversed in part, and this cause is remanded for recalculation of real estate taxes and reconsideration of attorney fees in accordance with the above Opinion. In all other respects, the judgment of the trial court is affirmed.

It is further ordered that a mandate be sent to the Clermont County Court of Common Pleas for execution upon this judgment and that a certified copy of this Opinion and Judgment Entry shall constitute the mandate pursuant to App.R. 27.

Costs to be taxed 30% to appellant and cross-appellee and 70% to appellee and cross-appellant.

/s/ Matthew R. Byrne, Presiding Judge

/s/ Robert A. Hendrickson, Judge

/s/ Robin N. Piper, Judge