[Cite as *Xerion Advanced Battery Corp. v. Certa Vandalia, L.L.C.*, 2026-Ohio-1307.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| XERION ADVANCED BATTERY CORP. ET AL. | : | C.A. No. 30553 |
| | : | |
| Appellees | : | Trial Court Case No. 2023 CV 05544 |
| | : | |
| v. | : | (Civil Appeal from Common Pleas Court) |
| | : | |
| CERTA VANDALIA LLC | : | |
| | : | **FINAL JUDGMENT ENTRY &** |
| Appellant | : | **OPINION** |

. . . . . . . . . . .

Pursuant to the opinion of this court rendered on April 10, 2026, the judgment of the trial court is affirmed.

Costs to be paid as stated in App.R. 24.

Pursuant to Ohio App.R. 30(A), the clerk of the court of appeals shall immediately serve notice of this judgment upon all parties and make a note in the docket of the service. Additionally, pursuant to App.R. 27, the clerk of the court of appeals shall send a certified copy of this judgment, which constitutes a mandate, to the clerk of the trial court and note the service on the appellate docket.

For the court,

*Christopher B. Epley*

_____
CHRISTOPHER B. EPLEY, JUDGE

LEWIS, P.J., concurs.

TUCKER, J., dissents.

OPINION

JEFFREY M. NYE, Attorney for Appellant
MATTHEW M. SUELLENTROP, JAMES H. GREER, DAVID C. GREER, and KAYLIN R. JARECKI, Attorneys for Appellee

EPLEY, J.

{¶ 1} Certa Vandalia, LLC ("Certa"), appeals from a judgment of the Montgomery County Common Pleas Court on a claim for declaratory judgment by Xerion Advanced Battery Corp. and Northwoods Blvd., LLC (collectively, "Northwoods"). Certa asserts that the trial court erred when it determined that Northwoods did not materially breach the terms of the parties' purchase and sale agreement ("PSA"), denied its motion for summary judgment against Northwoods, and granted summary judgment in favor of Northwoods. For the following reasons, the trial court's judgment is affirmed.

**I. Facts and Procedural History**

{¶ 2} On August 19, 2019, Northwoods and Certa entered into the PSA for the lease and sale of a commercial warehouse building located at 250 Northwoods Boulevard in Vandalia, Ohio. Northwoods was to pay monthly rent of $45,000 due on the first of each month. Pursuant to the PSA, any rent payments not received by the fifth day of the month were subject to a $2,000 cure payment plus 18% interest. The terms of the PSA allowed Northwoods to make a cure payment for any late rent payment within thirty calendar days of the first day of the month that was past due. Northwoods acknowledges that it did not make its August 2020 monthly rent payment until August 28, 2020, and no cure payment was made. Certa did not declare a default or demand the cure payment.

{¶ 3} In June 2021, Northwoods made its monthly rent payment on June 9, 2021, and it was received by Certa on June 10, 2021. Certa then sent a notice of default of lease to

2

Northwoods, stating that Northwoods was in default and demanding the cure payment by July 1, 2021. Northwoods contends that it made the cure payment on July 1, 2021, but Certa did not receive the payment until after that date.

{¶ 4} On November 17, 2021, Certa sent another notice of default of lease to Northwoods, alleging default for failure to obtain occupancy permits. Certa noticed a cure period that expired December 17, 2021. Certa did not pursue the default, and the parties continued to perform under the PSA.

{¶ 5} In August 2023, Northwoods made its monthly rent payment on August 8, 2023. Certa did not send a notice of default, and Northwoods made its September 2023 rent payment on September 1, 2023.

{¶ 6} On September 4, 2023, Certa sent a notice of default and termination of lease to Northwoods, citing nonpayment of the $2,168.62 cure payment for August 2023, which stated that the lease was terminated and that Northwoods had forfeited all monies paid to date under the terms of the PSA. Northwoods sent the cure payment to Certa on September 5, 2023. Certa returned the September 1, 2023 rent payment and refused to accept any additional rent payments.

{¶ 7} Northwoods sought a declaratory judgment from the trial court that it was not in default of the PSA, that it had not materially breached the PSA, and that the PSA would remain in full force and effect. Alternatively, Northwoods sought monetary damages for breach of contract, promissory estoppel, and unjust enrichment. On December 11, 2023, Certa filed an answer and counterclaim, asserting claims for breach of contract, breach of guaranty, quiet title, and declaratory judgment. At Northwoods' request, a magistrate granted a preliminary injunction to maintain the status quo during the pendency of the action.

**{¶ 8}** Northwoods moved for summary judgment on January 11, 2024, asserting that it did not commit a material breach of the PSA and that Certa did not suffer any damages because of the alleged breach. Regarding Certa's claim that Northwoods' payment of its August 2023 rent three days past due constituted a material breach of the PSA, Northwoods argued that the PSA "clearly regards [Northwoods'] alleged breach as non-material because the prescribed remedy for [Northwoods'] breach was an administrative late fee." Northwoods took issue with Certa's interpretation of the PSA that "an event of Default occurs upon either of the following events: non-payment of 'Rent' within the Cure Period, *or*, separately, non-payment of the 'Cure Payment' within the 'Cure Period' defined in §4.7." Rather, Northwoods argued that although non-payment of rent is considered a material breach due to its impact on the fundamental rights of the parties, failure to make the cure payment has no impact on the fundamental rights of the parties, which is why the PSA designates the cure payment merely as an "administrative late fee." Northwoods further argued that to constitute a material breach, the non-payment of rent must be ongoing and uncured, and that to have the option to cure, the rent must be delinquent. Northwoods asserted that because it had paid the August 2023 rent, it was no longer past due and there was no default.

**{¶ 9}** Northwoods further maintained that it could not have been in default for failure to cure because Certa did not provide written notice as required under §4.7 of the PSA. Northwoods maintained that once the rent was paid, Certa was required to provide written notice to Northwoods of the lack of cure payment. Once Certa provided that notice on September 4, 2023, Northwoods had thirty days to cure. Northwoods asserted that it submitted the cure payment immediately and therefore Certa had no basis under the PSA to terminate the lease and seek forfeiture of Northwoods' interest in the property.

4

{¶ 10} On February 29, 2024, Certa filed its motion for summary judgment against Northwoods. Certa emphasized the inclusion of the statement that "time is of the essence" in the PSA with regard to the payment of rent. It argued that, "[w]hen time is of the essence, any delay in performance is generally viewed as a material breach." Certa contended that under the terms of the PSA, the August 2023 rent payment was late because it was due no later than August 5 and was not paid until August 8. Further, Certa argued that Northwoods was required to make any cure payment within thirty days of the first day of the month that the rent was past due, meaning no later than August 30, 2023. Accordingly, Certa maintained that the cure payment submitted on September 4, 2023 was also untimely and constituted a material breach.

{¶ 11} With respect to the issue of notice, Certa referred to language in the PSA that "in the event of non-payment of Rent, no notice to [Northwoods] is required before such non-payment is considered a Default." It interpreted this language to mean that "a breach for failure to pay Rent by the first of the month and pay the Cure Payment within the Cure Period under Section 17.1.1 does not require any notice." Certa also addressed Northwoods' assertion that Certa's conduct would result in a forfeiture, noting that the defaulting tenant receives the right to sell the property and recoup its investment. Certa stated that this is a benefit to Northwoods. Certa requested that the trial court overrule Northwoods' motion for summary judgment and grant judgment in Certa's favor as a matter of law with respect to its counterclaims.

{¶ 12} The trial court heard oral arguments from the parties regarding the motions for summary judgment on June 13, 2025, and issued a decision on July 10, 2025. The trial court acknowledged that the relevant inquiry at the heart of this dispute is "whether Certa was required to provide written notice prior to declaring a default based upon [Northwoods']

5

failure to remit the cure payment within the cure period." The trial court disagreed with Certa's interpretation of §17.1.1 of the PSA that it was not required to provide notice to Northwoods before declaring a default for failure to make the cure payment. Instead, the trial court found that the PSA was ambiguous with respect to this issue. Due to this ambiguity, the trial court looked to the PSA as a whole, as well as the parties' prior conduct and course of performance.

{¶ 13} The trial court found that although §17.1.1 provides that no notice is required before Certa can declare a default for non-payment of rent, this section does not address whether the non-payment of a cure payment may constitute a default without notice. When it considered the parties' course of performance, the trial court referenced the August 2020 rent payment, which was twenty-eight days past due, for which Certa did not issue notice of default or request a cure payment, as well as the June 2021 rent payment, for which Certa issued a written notice to Northwoods advising of its obligation to remit the cure payment.

{¶ 14} The trial court held that based upon the ambiguity of the plain language of the PSA and the parties' past course of conduct, it was reasonable to interpret the PSA as requiring Certa to provide written notice to Northwoods that it was exercising its right to receipt of the cure payment. It further noted that Northwoods' failure to timely submit the cure payment for the August 2023 rent payment was the result of "confusion created by the ambiguous notice provisions of the contract, combined with Certa's inconsistent enforcement of the notice and cure provision."

{¶ 15} Therefore, the trial court held that Northwoods was entitled to a declaratory judgment that it is not in default of the PSA; it had not materially breached the PSA; the PSA had not been terminated and remained in full force and effect; and Certa was estopped from asserting that the PSA was terminated due to Northwoods' failure to timely remit the cure

6

payment for August 2023. The trial court also granted judgment in favor of Northwoods as to most of Certa's counterclaims. However, as to Northwoods' claim for breach of contract and Certa's counterclaim seeking declaratory judgment, the trial court determined that there was a genuine issue of material fact as to whether Certa complied with §18 of the PSA by notifying Northwoods of its alleged default. Finally, the trial court overruled Certa's objections to the magistrate's decision granting a preliminary injunction. The trial court found that its decision was final and appealable because it issued a declaratory judgment that set forth its interpretation of the PSA.

{¶ 16} On August 25, 2025, following the filing of this appeal, this Court issued an order stating that the trial court's decision was not final and appealable to the extent that it overruled Certa's objections to the magistrate's decision regarding the preliminary injunction. We ordered Certa to "show cause why the scope of this court's review of the decision should not be narrowed to the remainder of the judgment which, for example, resolved the parties' competing summary judgment motions." Certa responded to the show cause order conceding that the trial court's denial of its objections to the magistrate's decision was interlocutory in nature. Therefore, we determined that our show cause order was not satisfied and stated that we would not review the trial court's denial of Certa's objection to the magistrate's decision.

## II. Appellate Review

{¶ 17} In its assignment of error, Certa asserts that the trial court erred by denying Certa's motion for summary judgment and granting summary judgment in favor of Northwoods. We review the trial court's ruling on a summary judgment motion de novo. *Martcheva v. Dayton Bd. of Edn.,* 2021-Ohio-3524, ¶ 35 (2d Dist.).

7

**{¶ 18}** "The burden of demonstrating that no genuine issues exist as to any material fact falls upon the moving party requesting a summary judgment." *Harless v. Willis Day Warehousing Co., Inc.*, 54 Ohio St.2d 64, 66 (1978). Once the moving party has satisfied its burden of showing that there is no genuine issue of material fact, the burden shifts to the nonmoving party to set forth specific facts showing a genuine issue for trial. *Dresher v. Burt*, 75 Ohio St.3d 280, 293 (1996). The nonmoving party cannot rely on the mere allegations or denials in the pleadings but must provide evidence setting forth specific facts showing that there is a genuine issue of material fact for trial. Civ.R. 56(E). *Accord Geloff v. R.C. Hemm's Glass Shops, Inc.*, 2021-Ohio-394, ¶ 14 (2d Dist.). When the standard is met, summary judgment must be awarded as a matter of law.

**{¶ 19}** "'The cardinal purpose for judicial examination of any written instrument is to ascertain and give effect to the intent of the parties.'" *PNC Bank, N.A. v. Springboro Med. Arts, Inc.*, 2015-Ohio-3386, ¶ 16 (2d Dist.), quoting *Foster Wheeler Enviresponse, Inc. v. Franklin Cty. Convention Facilities Auth.,* 78 Ohio St.3d 353, 361 (1997). "'The intent of the parties to a contract is presumed to reside in the language they chose to employ in the agreement.'" *Id.*, quoting *Kelly v. Med. Life Ins. Co.*, 31 Ohio St.3d 130 (1987), paragraph one of the syllabus. "'Under such circumstances, a court may not go beyond the plain language of the agreement to determine the parties' rights and obligations, and it may not consider parole [sic] evidence of the parties' intentions.'" (Bracketed text in original.) *Id.*, quoting *SFJV 2005, L.L.C. v. Ream*, 2010-Ohio-1615, ¶ 22 (2d Dist.).

**{¶ 20}** "A contract is generally defined as a promise, or set of promises, actionable upon breach." (Cleaned up.) *PNC Bank* at ¶ 22. "Essential elements of a contract include an offer, acceptance, contractual capacity, consideration (the bargained for legal benefit and/or detriment), a manifestation of mutual assent and legality of object and consideration."

(Cleaned up.) *Id.* A meeting of the minds as to the essential terms of the contract is also required in order for the contract to be enforceable. *Id.* "'A meeting of the minds occurs if "a reasonable person would find that the parties manifested a present intention to be bound by the agreement."'" *Id.*, quoting *Champion Gym & Fitness, Inc. v. Crotty*, 2008-Ohio-5642, ¶ 12 (2d Dist.), quoting *Zelina v. Hillyer*, 2005-Ohio-5803, ¶ 12 (9th Dist.). "'And to be enforceable, "the contract must be definite and certain."'" *Id.*, quoting *Rayess v. Educational Comm. for Foreign Med. Graduates,* 2012-Ohio-5676, ¶ 19.

{¶ 21} "'Contractual language is "ambiguous" only where its meaning cannot be determined from the four corners of the agreement or where the language is susceptible of two or more reasonable interpretations.'" *PNC Bank* at ¶ 30, quoting *United States Fid. & Guar. Co. v. St. Elizabeth Med. Ctr.*, 129 Ohio App.3d 45, 55 (2d Dist. 1998). "'If an ambiguity exists in a contract, then it is proper for a court to consider "extrinsic evidence," i.e., evidence outside the four corners of the contract, in determining the parties' intent.'" *Id.*, quoting *United States Fid. & Guar.* at 55-56. "Such extrinsic evidence may include (1) the circumstances surrounding the parties at the time the contract was made, (2) the objectives the parties intended to accomplish by entering into the contract, and (3) any acts by the parties that demonstrate the construction they gave to their agreement." *United States Fid. & Guar.* at 56. "'Courts may not, however, use extrinsic evidence to create an ambiguity. Rather, the ambiguity must be patent; that is, apparent on the face of the contract.'" *PNC Bank* at ¶ 30, quoting *Schachner v. Blue Cross & Blue Shield of Ohio,* 77 F.3d 889, 893 (6th Cir. 1996).

{¶ 22} Here, the PSA includes the following provisions regarding default by Northwoods:

9

Section 17.1 Events of Default. The occurrence of any of the following will be deemed to be a breach by Tenant of its obligations under this Agreement (each, a "Default").

Section 17.1.1 Failure to Pay. If Tenant fails to deliver any payment of Rent to Landlord on or before the first day of the month and fails to pay the Cure Payment within the Cure Period as set forth in Section 4.7 above, time being of the essence (in event of non-payment of Rent, no notice to Tenant is required before such non-payment is considered a Default);

. . .

Section 17.1.3 Failure to Perform. If Tenant fails in the prompt and full performance of provision [sic] of this Agreement and such Default continues for thirty (30) days following written notice from Landlord to Tenant or for a reasonable period of time if thirty (30) days is not sufficient time to repair, remedy, or correct such Default.

. . .

Section 17.2 Remedies after Tenant Default: Upon the occurrence of any of the foregoing events of Default that continue beyond any applicable notice and Cure Period, and providing that [various additional requirements have been met], Tenant shall have the right to market and sell the Property . . . .

{¶ 23} With respect to late payments, Section 4.7 of the PSA states:

To compensate Landlord for administrative costs, a late fee of Two Thousand Dollars ($2,000.00), along with interest on rents and fees at 18% per annum (1.5% per month, but not to exceed the interest allowed by law in the State of

Ohio for transactions of this type) ("Cure Payment") shall be added to all Rent payments past due by five (5) calendar days. If Tenant fails to pay the Rent as and when due, Tenant has the right to cure the breach once every twelve (12) month time period but Landlord must receive both the Rent as well as the Cure Payment within thirty (30) calendar days of the first day of the month that is past due, time being of the essence . . . .

{¶ 24} For our analysis, we first look to whether the plain language of the PSA is ambiguous. Although Certa contends that it was not required to send notice to Northwoods prior to declaring default for failure to timely pay the cure payment, the relevant sections of the PSA are unclear. Section 17.1.1 clearly states that no notice is required before the non-payment of *rent* is considered a default. However, Section 17.1.3 contemplates a situation where Northwoods is in default, and that default continues for thirty days "*following written notice from Landlord to Tenant.*" (Emphasis added). Accordingly, there are two reasonable interpretations of these sections of the PSA and of whether Certa was required to give notice to Northwoods notice regarding the cure payment. In addition, the language regarding the cure period is ambiguous. Although Section 4.7 requires that the late rent payment and cure payment must be made within thirty days of the first day of the month that is past due, Section 17.1.3 states that default for non-payment or non-performance occurs when the default continues for thirty days "*following written notice from Landlord to Tenant.*" These provisions indicate that the thirty-day cure period does not begin on the first day of the month rent is due, but thirty days following notification by Certa of the breach and failure to remit the cure payment. Because of this ambiguity, it is appropriate and necessary to consider extrinsic evidence to determine the parties' intent.

**{¶ 25}** The most instructive piece of extrinsic evidence in this matter is the prior conduct of the parties. There is no dispute that Northwoods made late rent payments on multiple occasions before the one at issue here. In August 2020, its rent payment was late by twenty-eight days, and no cure payment was made. In June 2021, Certa did not receive the rent payment from Northwoods until June 10, after which Certa notified Northwoods of the default and demanded the cure payment. Similarly, on November 17, 2021, Certa sent a notice of default to Northwoods for failure to obtain occupancy permits, but it did not ultimately pursue the default.

**{¶ 26}** Ohio courts have determined that "if the vendor acquiesces in the payment of any of the earlier installments after the time fixed and thus lulls purchaser into the belief that prompt payment will not be insisted upon, he should, if he desires to insist upon a strict performance by the purchaser as to future installments, give him notice to that effect." (Cleaned up.) *Hegg v. Sigle,* 14 Ohio Law Abs. 456, 459 (7th Dist. 1933). Based on the ambiguity in the language of the PSA itself and the parties' varying and inconsistent responses to multiple previous events of default, it is apparent that Certa should have provided notice to Northwoods that it was required to make the cure payment and should have allowed thirty days from the date of that notice for Northwoods to cure any default. There was no genuine issue of material fact that Certa failed to provide any such notice. Therefore, as a matter of law, Northwoods did not breach the PSA.

**{¶ 27}** Additionally, when considering the impact of Certa's attempted termination of the PSA, it appears that an unequitable forfeiture would result. It is well-settled that "[e]quity abhors a forfeiture and will only decree it when such relief is clearly required." *Whitmore v. Meenach*, 33 N.E.2d 408, 410 (2d Dist. 1940). "Where the breach is compensable in money a tender of payment of the amount due will ordinarily be deemed sufficient reason to avoid

the forfeiture." *Id.* Although Certa would like to declare Northwoods in default over the approximately $2,000 cure payment, we cannot ignore the years-long pattern of performance and past cooperation of the parties under the PSA. Notably, Northwoods has already paid approximately $3,000,000 under the PSA in rent payments as well as a down payment in anticipation of ultimately purchasing the property. Other than the late cure payment, there is no evidence of damages to Certa that could not be remedied by its acceptance of Northwoods' late rent and cure payment, and Northwoods has expressed its desire to continue operating under the terms of the PSA.

{¶ 28} Based on the foregoing, the PSA is ambiguous with respect to the requirement of notice for non-payment of the cure payment, and the parties' prior conduct with respect to events of default demonstrates that Northwoods did not breach the PSA. Certa's interpretation of the PSA would result in the unequitable forfeiture of Northwoods' interest in the property, allowing it to terminate the PSA over $2,000 after years of cooperation between the parties and Northwoods' investment of millions of dollars in its performance under the PSA. Although Certa contends that Northwoods would be able to attempt to sell the property, this would require additional expenditures and loss on the part of Northwoods. Therefore, we conclude that the trial court did not err in granting Northwoods' motion for summary judgment against Certa and denying Certa's motion for summary judgment against Northwoods.

{¶ 29} Certa's assignment of error is overruled.

### III. Conclusion

{¶ 30} The judgment of the trial court is affirmed.

. . . . . . . . . . . . .

LEWIS, P.J., concurs.

13

TUCKER, J., dissents:

{¶ 31} I conclude that, together, PSA Sections 17.1, 17.1.1, and 4.7 unambiguously provide that a late rent payment (any payment not received on or before the first day of the month) placed Northwoods, without notice being required, into default, with time being of the essence. The PSA sections further unambiguously state that Northwoods, once every twelve months, can cure a default by making a "cure payment" as set forth in Section 4.7, but both the rent and cure payments had to be received by Certa within thirty days of the first day of the month that was past due, again time being of the essence.

{¶ 32} Thus, in my view, PSA Section 17.1.1 only, and explicitly, defines and regulates a contractual default triggered by a late rent payment. Stated somewhat differently, Section 17.1.1 is a stand-alone provision not tethered to Section 17.1.3's default notice requirement, which concerns contractual breaches other than the late payment of rent. These conclusions, and thus the contract's meaning, can be determined "from the four corners of the [contract]," as its provisions "[are not] susceptible of two or more reasonable interpretations." *PNC Bank*, 2015-Ohio-3386, at ¶ 30 (2d Dist.), quoting *United States Fid. & Guar.*, 129 Ohio App.3d at 55.

{¶ 33} Based on these conclusions, I dissent from the majority opinion's conclusion that Section 17.1.3's notice requirement creates an ambiguity allowing consideration of extrinsic evidence to determine the parties' intent. And, of course, I further dissent from the majority opinion's ultimate conclusion that the extrinsic evidence establishes that Northwoods did not breach the contract.

{¶ 34} Certa's assignment of error contends only that the trial court erred by granting summary judgment to Northwoods. Since I conclude the trial court did so err, I would remand the case to the trial court for further proceedings.

14